ERIE–LACKAWANNA RAILROAD COMPANY, Plaintiff,

v.

UNITED STATES of America and Interstate Commerce Commission, Defendants.

The Delaware and Hudson Railroad Corporation, Chicago & Eastern Illinois Railroad Company, Milton J. Shapp, City of Scranton, Borough of Freedom, and Boston and Maine R. R. Co., Intervening Plaintiffs,

Pennsylvania Railroad Company, New York Central Railroad Company, and Richard Joyce Smith and William J. Kirk, as Trustees for the New York, New Haven & Hartford Railroad Company, Debtor, Intervening Defendants.

The BALTIMORE AND OHIO RAILROAD COMPANY, the Chesapeake and Ohio Railway Company, and Norfolk and Western Railway Company, Plaintiffs,

v.

UNITED STATES of America, Defendant.

The CENTRAL RAILROAD COMPANY OF NEW JERSEY and Reading Company, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Western Maryland Railway Company, Intervening Plaintiff.

OSCAR GRUSS & SON, Plaintiff,

v.

UNITED STATES of America and Interstate Commerce Commission, Defendants.

The New York, New Haven and Hartford Railroad Company First Mortgage 4% Bondholders Committee, Intervening Plaintiff,

The New York Central Railroad Company, the Pennsylvania Railroad Company, and Richard Joyce Smith and William J. Kirk, as Trustees for the New York, New Haven & Hartford Railroad Company, Debtor, Intervening Defendants.

The DELAWARE AND HUDSON RAIL-ROAD CORPORATION, and Norfolk and Western Railway Company, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Boston and Maine Corporation, John Hancock Mutual Life Insurance Company, the Prudential Insurance Company of America, Aid Association for Lutherans, and Woodmen of the World Life Insurance Society, Intervening Plaintiffs,

Interstate Commerce Commission, Erie-Lackawanna Railroad Company, Intervening Defendants.

Nos. 66 Civ. 2860, 2903, 2914, 3413, 67 Civ. 2451.

United States District Court
S. D. New York.

Oct. 19, 1967.

Cravath, Swaine & Moore, by Thomas D. Barr, Harry H. Voigt, Eldon Olson, John M. Linsenmeyer, and Alexander & Green, New York City, for Erie-Lackawanna R.R.

Nixon, Mudge, Rose, Guthrie, Alexander & Mitchell, by Harry G. Silleck, Jr., New York City, for Delaware & H. R.R.

Sidley & Austin, by Howard J. Trienens and George Saunders, Jr., Chicago, Ill., Kelley, Drye, Newhall, Maginnes & Warren, by Frank H. Heiss, New York City, Wilmer, Cutler & Pickering, and Wheeler & Wheeler, Washington, D. C., for Norfolk & W. Ry., Baltimore & O. R.R., Chesapeake & O. Ry. and Western Maryland Ry.

Macklin, Hanan & McKernan, by Timothy A. Hanan, New York City, and William P. Quinn, Philadelphia, Pa., for Reading Co.

Hogan & Hartson, by Edward A. McDermott and James A. Belson, Washington, D. C., and Richard C. Casey, New York City, for Boston & M. R. R.

Windsor F. Cousins, Philadelphia, Pa., and Conboy, Hewitt, O'Brien & Boardman, by Edward F. Butler, Hobart L. Brinsmade and David J. Mountan, Jr., New York City, for Pennsylvania R.R.

Gerald E. Dwyer, James B. Gray and Jerome H. Shapiro, New York City, for New York Cent. R.R.

Sullivan & Worcester, by Joseph Auerbach, Boston, Mass., and James Wm. Moore, New Haven, Conn. and Robert M. Peet, New York City, for Richard Joyce Smith and William J. Kirk.

William G. Mahoney, Washington, D. C., and Reilly, Curry & Gibbons, by Paul G. Reilly, Jr., New York City, for Railway Labor Executives Ass'n.

Donovan, Leisure, Newton & Irvine, by Malcom Fooshee and Granville Whittlesey, Jr., New York City, for John Hancock Mutual Life Ins. Co., Prudential Ins. Co. of America, Aid Ass'n for Lutherans, and Woodmen of the World Life Ins. Soc.

Myron S. Isaacs, New York City, for Oscar Gruss & Son.

Migdal, Low, Tenney & Glass, by Lester G. Migdal and Lawrence W. Pollack, New York City, for New Haven First Mortgage Bondholders Committee.

Robert W. Ginnane, Leonard S. Goodman, Betty Jo Christian and Fritz R. Kahn, and Jerome Nelson, Washington, D. C., for Interstate Commerce. Commission.

Howard E. Shapiro, Washington, D. C., Joel A. Forkosch and Michael D. Hess, New York City, and William R. Weissman, Washington, D. C., for United States.

Arthur A. Arsham, New York City, and Gordon P. MacDougall, Washington, D. C., for City of Scranton and Milton J. Shapp.

Walter J. Myskowski, Washington, D. C., for State of New York.

Robert M. Schacht, Providence, R. I., for State of Rhode Island.

Leon S. Wolk, Fort Lee, N. J., for State of New Jersey.

Samuel Kanell, Hartford, Conn., for State of Connecticut.

Edward W. Hanley, III, Boston, Mass., for Commonwealth of Massachusetts.

John R. Thompson, New York City, for City of New York.

Alan J. Littau, New York City, for Port of New York Authority.

Robert M. Morgenthau, U. S. Atty., for Southern Dist. of New York, Brian J. Gallagher, Asst. U. S. Atty., for the United States and the Interstate Commerce Commission.

Shea & Gardner, Washington, D. C., for trustees of property of Central Railroad of New Jersey, debtor, William H. Dempsey, Jr., Washington, D. C., of counsel.

Richard J. Lally, Richard B. Wachenfeld, Newark, N. J., for Central Railroad of New Jersey.

Before FRIENDLY, Circuit Judge, and WEINFELD and LEVET, District Judges.

FRIENDLY, Circuit Judge:

We have before us, on final hearing, actions to enjoin the enforcement of orders of the Interstate Commerce Commission in F.D. 21989 and 21990, see 327 I.C.C. 475, 328 I.C.C. 304, and 330 I.C.C. 328, authorizing the merger of Pennsylvania Railroad Company (PRR) and New York Central Railroad Company (NYC) into a single company (Penn-Central), and in F.D. 21510, see 330 I.C.C. 780 and 331 I.C.C. 22, directing the Norfolk & Western Railway System (N & W) to include Erie-Lackawanna Railroad Company (E-L), The Delaware & Hudson Railroad Corporation (D & H) and the Boston & Maine Corporation (B & M) on terms therein specified. The orders come before us as a result of three separate actions or sets of them. The first set, sometimes hereafter referred to as the merger actions, consists of three suits, 66 Civ. 2860, 2903 and 2914, D.C., attacking the orders in F.D. 21989 and 21990.[1] A year ago we denied temporary injunctions in these suits, Judge Weinfeld dissenting on the ground that the Commission had not finalized the "Appendix G conditions" for the protection of E-L, D & H and B & M, 259 F.Supp. 964 (S.D. N.Y.1966), and were subsequently reversed by a closely divided Supreme Court, 386 U.S. 372, 87 S.Ct. 1100, 18 L. Ed.2d 159 (1967). In a supplemental report, served June 12, 1967, the Commission revised and completed the Appendix G conditions; on September 11, 1967, the Commission denied petitions for further reconsideration but on August 3 and September 12 it modified its order with respect to the New York, New Haven & Hartford Railroad Company (NH) in certain respects discussed below. The second action, sometimes hereafter referred to as the New Haven action, 66 Civ. 3413, addressed to orders in the same docket, was brought by Oscar Gruss & Son, a large holder of the New Haven's First and Refunding Mortgage Bonds, and a committee representing other holders of such bonds intervened. We dismissed the complaint, as well as a separate action by the committee, 66 Civ. 3425, primarily for lack of standing, Oscar Gruss & Son v. United States, D.C., 261 F.Supp. 386 (S.D.N.Y.1966), but the Supreme Court vacated our order on Gruss' appeal, 386 U.S. 776, 87 S.Ct. 1478, 18 L.Ed.2d 520 (1967), and remanded for further consideration. The third action, 67 Civ. 2451, Delaware and Hudson R.R. Co. v. United States, sometimes hereafter referred to as the inclusion action, was brought by D. & H. to review the order in F.D. 21510 as this affected it;[2] B & M and four life insurance companies holding large amounts of E-L's bonds intervened as plaintiffs and, on motion of the United States and the Interstate Commerce Commission, we directed that N & W be joined as a plaintiff. E-L intervened as a defendant and all four roads affected by the inclusion order are thus parties. Because of the close relation among all three actions, we think it best to dispose of them in a single opinion despite the length which the number of issues necessarily entails.

We shall not here detail the procedural history whereby the threat that these related orders would become the subject of litigation in six or more different district courts has seemingly been averted and all issues concentrated in a single

1. The first of these was brought by E-L, D & H, and B & M. Chicago and Eastern Illinois R.R. Co., Milton J. Shapp, the City of Scranton, the City of Jersey City, and the Borough of Freedom intervened as plaintiffs. The second was brought by The Baltimore & Ohio R.R. Co. (B & O), The Chesapeake & Ohio R.R. Co. (C & O), and the N & W. The third was brought by the Central Railroad of New Jersey (CNJ) and The Reading Company; Western Maryland Railway intervened as a plaintiff.

2. By orders dated August 10 and September 1, 1967, the Commission modified its order to meet objections of the D & H; in the former it also denied petitions for reconsideration by B & M and N & W.

court of first instance. This can be found in our orders of July 3, and July 26, 1967, the orders of the District Court for the Middle District of Pennsylvania dated July 11 and 27, 1967, and the orders of the District Court for the Western District of Virginia dated July 14 and September 11, 1967. Suffice it to say at this point that in our view the proceedings reflect credit on the sober second thought of most counsel and, even more so, on the restraint of the "disciplined and experienced judges," see Kerotest Mfg. Co. v. C-O-Two Fire Equipment Co., 342 U.S. 180, 184, 72 S.Ct. 219, 96 L.Ed. 200 (1952), of the Third and Fourth Circuits, who have demonstrated that even the long out-moded machinery for review of orders of the Interstate Commerce Commission by suit before a three-judge district court can be made to work, although with creaks and strains that ought to be eliminated.

We have said "seemingly averted" because N & W continues to challenge the power of this court to entertain the inclusion action or at least to join it as a plaintiff. Relying on a passage in our order granting the motion for joinder, wherein we said that this "shall not prejudice any contention the N & W may wish to make in any court that the Western District of Virginia is the appropriate forum for review of the inclusion order," N & W seeks to reargue the venue issue we there decided against it. Mere reading of the passage shows that it was not intended to give N & W permission to reargue after the normal time for seeking this had passed; we wished only to make clear that the joinder of N & W *in the action in this district* relating to the inclusion order should not preclude argument that, assuming that either this court or the Virginia court

could lawfully proceed, the ends of justice would be better served by having the inclusion order reviewed by the latter. N & W now scarcely argues that point whose lack of merit this opinion will make abundantly clear, and the orders of the Virginia court indicate its agreement that *the merger and inclusion actions are so intertwined that they should be initially reviewed by the same court.* Nevertheless, because of the importance of avoiding any procedural defect in these proceedings, we have reconsidered N & W's arguments.

■ We may accept *arguendo*, without however deciding, that, as N & W urges, D & H does not have its "residence or principal office" here within the meaning of 28 U.S.C. § 1398(a) since its complaint fixes its principal place of business in Albany in the Northern District of New York, although it is a New York corporation and does business in the Southern District.[3] Concededly none of the intervening plaintiffs has its residence or principal office here. Nevertheless, since 28 U.S.C. § 1398(a) goes to venue and not to jurisdiction, joinder is authorized by the first sentence of amended Rule 19(a). Whereas former Rule 19(b) permitted compulsory joinder only of parties "subject to the jurisdiction of the court as to both service of process and venue," the new Rule 19(a) allows joinder of "a person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action" subject to his entitlement to dismissal when his joinder "would render the venue of the action improper." The amendment, which has been characterized as "a restructuring of major proportions," see 2 Barron & Holtzoff, Federal Practice & Procedure § 511

3. While it has been generally held that a corporation "resides" only in the district of the chartering state where its principal office is located, Galveston, H. & S. A. Ry. v. Gonzalez, 151 U.S. 496, 14 S.Ct. 401, 38 L.Ed. 248 (1894); Wood v. Delaware & H. R.R., 63 F.2d 235 (2 Cir. 1933), it is arguable that a different result should follow under 28 U.S.C. § 1398(a) which permits it to sue either in the district of its residence or in that of its principal office since the usual construction would make the alternative illusory in the common case where the principal office is in the incorporating state. However, we find it unnecessary to pass upon this.

(1966 pocket part), could hardly have a more suitable application than when one party (N & W) claims an order of the Interstate Commerce Commission to be too favorable to all the others, one of the latter contends it is not sufficiently so, and still others say it is just right. There remains the contention based on the last sentence of the Rule.[4] The letter of this does not cover N & W. If venue were ever improper, it was because D & H has its principal office in Albany rather than in New York City, and that defect, if it were one, see fn. 3, was waived by the United States. Adding N & W as a party plaintiff did not make the alleged defect more serious—*its* joinder did not "render the venue of the action improper" within the language of the Rule.

We see no reason for expanding on the letter under the circumstances of this case. The last sentence of Rule 19(a) seems to have been framed in the light of the then requirement that in diversity actions all plaintiffs or all defendants reside in the district, and the requirement that in all other cases, save as otherwise provided, all defendants so reside, 28 U.S.C. §§ 1391(a) and (b). Evidently it was thought anomalous and perhaps contrary to the will of Congress as expressed in those sections that compulsory joinder should lie when the party joined could not initially have joined as a plaintiff or been joined as a defendant without provoking a valid venue objection. But there is nothing anomalous or contrary to the intent of 28 U.S.C. § 1398(a) in joining N & W in the instant case. N & W's presence as an additional plaintiff does not give rise to a new venue objection as it would under a provision like that in 28 U.S.C. § 1391(a) requiring that *all* plaintiffs reside in the district. Indeed the typical action by railroads to enjoin important orders of the Interstate Commerce Commission includes plaintiffs residing or

having their principal office in many states, as witness the plethora of multi-plaintiff actions bearing the names of the Abilene & Southern, the Akron, Canton & Youngstown and the Ann Arbor.[5] Both the present statute and its predecessor, 38 Stat. 219–220 (1913), recognized that in such matters the presence of one plaintiff for whom venue was proper suffices for all and process may then be served throughout the United States, 28 U.S.C. § 2321. If one railroad has chosen to sue in a venue to which objection could have been taken but the United States as sole named defendant does not object, no policy is served by allowing another railroad complaining of the order to do so. See Hoiness v. United States, 335 U.S. 297, 69 S.Ct. 70, 93 L.Ed. 16 (1948). This court having been seized of the action, it is immaterial that, as a result of the Commission's decisions on reconsideration, 331 I.C.C. 22, D & H no longer complains of the inclusion order; the action continues for disposition of the complaints of the intervening plaintiffs and of N & W.

### I. THE MERGER ACTIONS

██ The only parties who have ever challenged in this court the Commission's basic finding that the Penn-Central merger is in the public interest were intervening plaintiffs Milton J. Shapp, the City of Scranton and the Borough of Freedom. After the Commission had entered its supplemental order served June 12, 1967, the Borough of Moosic brought an action in the District Court for the Middle District of Pennsylvania to enjoin the merger. Shapp and the City of Scranton intervened therein and the City of Pottsville applied for intervention; we are advised that the Borough of Moosic was represented by the same attorneys who appeared here for Shapp and the City of Scranton and that the complaint was

4. "If the joined party objects to venue and his joinder would render the venue of the action improper, he shall be dismissed from the action."

5. It is worth noting that neither N & W nor its allies in the action brought by them

to enjoin the merger order, 66 Civ. 2903, Baltimore & Ohio Railroad Co. v. United States, resided or had their principal office in the Southern District of New York.

substantially the same as that heretofore presented in this court. On July 11, the District Court for the Middle District of Pennsylvania stayed proceedings before it until October 1. Shapp and the City of Scranton moved to stay proceedings on their intervening complaints here or, in the alternative, to permit their dismissal without prejudice. In our order of July 26, 1967, we denied these motions but extended the time fixed for these intervenors to file a supplemental complaint; we also stated that we would permit the Borough of Moosic and the City of Pottsville to intervene. They did not accept the invitation, and Shapp and the City of Scranton failed to file supplemental complaints or further briefs as directed by our orders. The United States and the Interstate Commerce Commission have moved pursuant to F.R. Civ.P. 41(b) that we dismiss the complaints of Shapp and the City of Scranton with prejudice for want of prosecution; PRR and NYC join in the motion. For reasons indicated in our previous orders we are wholly unpersuaded by the intervenors' contentions that their applications here were of limited scope and they should now be free to withdraw and challenge the merger orders in another court of their own choosing. Their case therefore falls within the ordinary rule that the claim of a litigant who refuses to file an amended or supplemental complaint or to comply with other lawful procedural orders of the court will be dismissed with prejudice. We therefore grant the motion for such dismissal.[6]

Chicago & Eastern Illinois Railroad Company has moved for dismissal of its intervening complaint with prejudice and we have granted that motion. We have also granted the unopposed motion of PRR and NYC for dismissal with prejudice of the intervening complaints of the parties listed in the margin[7] who have failed to file supplemental complaints or briefs as directed by our order of July 3.

The posture of the actions has changed in several other respects. The Trustees of CNJ, which has invoked § 77 of the Bankruptcy Act since the case was previously here, sought and were granted dispensation from the schedule for supplemental complaints, briefs and argument on their stipulation that, while reserving the right to assert that the order of the Commission should contain protective conditions for the benefit of CNJ, "they will not assert in any Court any claim that the Penn-Central merger should be delayed for any reason" or that the Appendix G conditions in favor of other carriers should be set aside. B & M has changed its position from opposition to support of immediate consummation of the Penn-Central merger. Finally, E–L and D & H now make no objection to the revised Appendix G conditions; they seek a further injunction only because the Commission failed to reserve jurisdiction to require Penn-Central to pay a capital loss indemnity and because it has authorized immediate consummation of the merger without completion of judicial review.

#### The Appendix G Conditions.

While the three protected roads make no objection to the Appendix G

---

6. While we entertain no doubt of the sufficiency of this ground, we think it well to add that, apart from any question as to standing, we find no merit in the complaints of Shapp and The City of Scranton. Much of their objection was directed against the portion of the order permitting E-L, D & H and B & M to petition in certain eventualities for inclusion in Penn-Central, but these roads could not be included in Penn-Central except on a finding that such inclusion was in the public interest and this would be subject to judicial review. The criticism that the Commission did not give adequate weight to the improved earnings of PRR and NYC during the course of the merger proceedings has been shattered by the results for the first half of 1967. Beyond this the attacks simply represent disagreement with procedural and policy determinations which Congress has committed to the Commission.

7. City of Hoboken; City of Union City; Township of North Bergen; Town of West New York; Township of Weehawken; City of Jersey City; Borough of Freedom.

traffic and current indemnity conditions, these continue to be the object of sharp criticism from N & W and the three roads, C & O, B & O and Western Maryland, making common cause with it. The specific claims are that the revenue indemnity conditions create a pooling agreement in defiance of § 5(1) of the Interstate Commerce Act; that they will unwarrantably injure the unprotected roads; and that there is no substantial evidence of the merger's being in the public interest so long as the Appendix G conditions remain in effect. We find these contentions without merit.

Section 5(1) makes it unlawful for any common carrier subject to chapters 1, 8 and 12 of the Interstate Commerce Act to "enter into any contract, agreement, or combination 'among carriers' for the pooling or division of traffic, or of service, or of gross or net earnings, or of any portion thereof" unless the Commission finds that such pooling or division "will be in the interest of better service to the public or of economy in operation, and will not unduly restrain competition." In its report on reconsideration of September 16, 1966, the Commission held that the Appendix G conditions were not within § 5(1) since they did not constitute a contract, agreement or combination entered into by the carriers involved and, less forcefully, that in any event § 5(2) (b) authorized it to approve a merger on such terms and conditions as it found "just and reasonable" even if these would otherwise violate some other prohibition of the Act, 328 I.C.C. at 326.[8] In a footnote to its supplemental report the Commission reiterated the former position but added that even if the revenue indemnification "con-

stituted pooling within the meaning of section 5(1), this record clearly supports findings as required by that subsection, i. e., that to protect these carriers clearly is in the interest of better service to the public" and "will not unduly restrain competition." 330 I.C.C. at 345 n. 8.

 We agree that financial indemnification to weaker railroads prescribed by a governmental agency as a condition to approval of a merger is not within the fair intendment of § 5(1) even though indemnification becomes effective only by the indemnitor's accepting the provisions as a condition to consummating the merger. While the construction urged by plaintiffs would, to say the least, be pressing language to its utmost bounds, we need not decide whether this reading would fall within or without the limit to which the words can be pushed. "This is not the way to read such legislation: It is true also of Acts of Congress that 'The letter killeth.'" United States ex rel. Knauff v. Shaughnessy, 338 U.S. 537, 548, 70 S.Ct. 309, 315, 94 L.Ed. 317 (1950) (dissenting opinion of Mr. Justice Frankfurter). Section 5(1) of the Interstate Commerce Act has been with us for a long time. Its lineage goes back to the original Act of 1887, § 5 of which made it unlawful for any common carrier subject to the Act "to enter into any contract, agreement, or combination with any other common carrier or carriers for the pooling of freights of different and competing railroads, or to divide between them the aggregate or net proceeds of such railroads, or any portion thereof * * *," 24 Stat. 380, and the evil at which it is aimed remains the same. "The mischief and defect for which the

8. While we find it unnecessary to pass upon this ground, the authority cited in the Commission's brief, Atlantic Coast Line R.R. v. United States, 284 U.S. 288, 52 S.Ct. 171, 76 L.Ed. 298 (1932), is inapposite. The Court there held that § 5 (2) permitted the Commission to condition its approval of a lease on the lessee's agreement to establish a through route that would short-haul itself although § 15(4) would have prevented the Commission from compelling this absent an application under § 5. There is a rather obvious distinction between a limitation on the power of the Commission such as § 15(4) and a declaration of illegality such as § 5(1). See Chicago & N. W. Ry. v. Peoria & Pekin Ry., 319 F.2d 117, 122 (7 Cir. 1963), in which the Court of Appeals held that approval of a pooling agreement under § 5(2) in an earlier proceeding did not satisfy the requirements of § 5(1).

common law did not provide," Heydon's Case, 3 Co. 72 (1584), consisted in truly consensual arrangements between carriers giving each an incentive to raise rates to the highest point and reduce service to the lowest point the traffic would bear. The framers of § 5 were acting against cartels; their words cannot fairly be used to invalidate a provision developed by the Commission, which then had no power to do so, to compel a stronger road to pay a portion of its revenues to weaker ones in order to enable the latter better to compete.[9]

The contention that the financial indemnity will injure N & W and other unprotected carriers rests on the theory, described in our previous opinion, 259 F.Supp. at 970, that the indemnity formula gives the protected carriers an abnormal incentive to throw interline traffic to Penn-Central rather than to the unprotected lines in order to increase the "standard revenue" of the protected carriers for a future year, and Penn-Central an abnormal incentive to throw such traffic to the protected carriers rather than to others in order to increase the formers' "earned revenue." After taking much evidence and engaging in extensive discussion, 330 I.C.C. at 353–56, the Commission found the contention unproved. While the studies submitted by the unprotected roads showed considerable amounts of traffic susceptible to diversion of the sort indicated, the Commission found that neither the protected roads nor Penn-Central would have either the motive or the ability to engage in such diversion on any substantial scale. The Commission nevertheless included in its findings "a provision that would pro-

hibit the protected carriers from engaging in manipulation, with sanctions if they do" and reserved jurisdiction to reopen the proceedings in the event of such manipulation and modify Appendix G accordingly, 330 I.C.C. at 355.

■■■ Forecasting the future ability and desire of railroads to effect diversion is peculiarly a matter for the expert judgment of the "tribunal appointed by law and informed by experience." Illinois Central R. R. v. I.C.C., 206 U.S. 441, 454, 27 S.Ct. 700, 704, 51 L.Ed. 1128 (1907). Almost all N & W's contentions on this subject simply reflect disagreement with conclusions which the evidence warranted the Commission in reaching and are thus beyond our power to review. There is only one possible exception. While the Commission found that the protected roads had no power to divert traffic in the interim covered by Appendix G, it held in the *Inclusion* case that the roads could divert traffic to N & W after their inclusion. N & W claims that the two findings contradict one another. The claim is readily answered. Once integrated into N & W, the protected roads will be able to offer shippers more efficient service. Under present conditions, however, shippers will gain little or nothing by permitting the protected roads to divert their traffic to Penn-Central. The position of these three lines as a permanent part of a strong N & W system will be altogether different from their present status. Moreover we see no reason to doubt the efficacy of the Commission's reservation of jurisdiction to take action against manipulation.[10]

9. Alternatively we see no reason why footnote 8 to the supplemental report, 330 I.C.C. at 345, does not meet the requirement of § 5(1). The footnote is not to be considered alone, as N & W and its allies propose, but along with the extensive discussion of the Appendix G conditions in all three reports. When these are read in their entirety, they amply support findings that the financial indemnity provisions "will be in the interest of better service to the public" by preserving the

viability of the three protected roads and that, in view of their limited and temporary character, the Commission's power to revise them, and the other considerations outlined in the Supplemental Report, 330 I.C.C. at 351–52, they will not "unduly restrain competition."

10. N & W and its allies contend they will be precluded from obtaining judicial review of denial of any complaints they may make on the score of manipulation, since paragraph 5A of Appendix G provides

We are similarly unpersuaded by N & W's contention that the Commission did not find, or in any event had no evidentiary basis for finding, that consummation of the merger under the Appendix G conditions would be in the public interest. Such a finding is implicit in the very concept of devising conditions permitting consummation prior to actual inclusion of the protected roads in a major system and was made explicit when the Commission said that only "some of the merger benefits" would be prevented and that the conditions would not work "an undue hardship upon applicants either in their operations or merger implementation." 327 I.C.C. at 532; see also 330 I.C.C. at 361. To deny evidentiary basis for this finding would defy common sense. An end to the uncertainty that has plagued the applicant roads for five and a half years would be enough. Nothing in Appendix G prevents the realignment of management, the elimination of many duplications in personnel, the undertaking of financing, or the refurbishing and, in many cases, the implementation of plans for better and more economical service. The Appendix G conditions impose no restrictions on activities concerning routes not competitive with the three protected lines; there are enough of these to absorb the energies of Penn-Central's management for some time. Beyond all these considerations early consummation of the merger not only will benefit the New Haven but is necessary to its survival. For, as will appear later, that road's condition has become far graver than when this case was last before us or the Supreme Court.

### Capital Loss Indemnity.

E–L, D & H, and N & W and its allies complain of the Commission's refusal, 330 I.C.C. at 359–60, to prescribe "capital loss indemnification" for any decrease in the price payable to the protected roads due to diversion of traffic to Penn-Central, whether before or after inclusion in a larger system, or even to reserve jurisdiction to do so. The Commission justified this on the basis that under its decision in the *Inclusion* case there would be no such decrease, 330 I.C.C. at 360. While E–L and D & H endorse that conclusion, they nevertheless claim that the failure to reserve jurisdiction on the capital loss issue was error. They fear that if N & W's objections to the inclusion provisions should be sustained either here or ultimately by the Supreme Court, it may be impossible for the Commission to devise equitable terms for their inclusion in N & W without Penn-Central paying a capital indemnity. Since E–L and D & H assert they cannot fairly be asked to accept a reduction in the sales price as a result of losses inflicted by the merged Penn-Central and N & W says it cannot be asked to pay more than the roads are worth in light of the Penn-Central merger, Penn-Central, it is contended, must be required to pay for the loss it has caused the protected roads and the Commission should have reserved jurisdiction to that end so that the legality of such a position could be determined before the merger was consummated.

So far as the fears of E–L and D & H relate to action by this court, they are mooted by our decision in the *Inclusion* case. For reasons stated in section IV of this opinion we doubt that any decision of the Supreme Court will demand downward revision of the terms. Moreover, we are not at all sure, for reasons developed in our discussion of the *Inclusion* case, that the Court or the Commission on a

that "All controversies arising under the appendix shall be determined with finality by the Interstate Commerce Commission," whose orders thereunder "shall not be reviewable in any court." The Commission says this is limited to controversies as to the application of Appendix G between Penn-Central and the three protected lines and not to action taken or re-

fused under the reservation of jurisdiction on the score of manipulation. This is surely a permissible reading—indeed in our view the natural one. In any event we accept the Commission's statement as a binding representation to that effect. Cf. American Telephone & Telegraph Co. v. United States, 299 U.S. 232, 241, 57 S.Ct. 170, 81 L.Ed. 142 (1936).

remand would subscribe to the view that N & W can only be required to pay a sum which takes account of post-Penn-Central-merger losses, or—for that matter—would accept the view of E–L and D & H that the Interstate Commerce Act requires them to be compensated for any decrease in price resulting from such losses. On the other hand we have little doubt that if PRR and NYC elect to consummate the merger before a final disposition by the Supreme Court, they take their chances as to any further conditions with respect to capital loss indemnity that the Court might direct the Commission to impose. While we would not have disapproved the reservation of jurisdiction which E–L and D & H advocate, we shall not direct the Commission to amend its order as they request.

N & W claims that a capital indemnity is needed even if, as it disputes, the Commission's finding that post-inclusion losses do not require a lower price should be affirmed. It says that while the Appendix G conditions may make the three roads substantially whole for traffic diverted to Penn-Central during the protected period, traffic once diverted to so powerful a competitor is not readily regained. The roads will therefore be worth less to N & W at the time of inclusion than if inclusion could be effected simultaneously with Penn-Central consummation, and Penn-Central must be required to pay the difference. Apart from our unwillingness to commit ourselves to the legal premise on which this argument necessarily rests, N & W's fears are factually unsupported.

There is no support for N & W's contention that despite the highly restrictive Appendix G traffic conditions, which, as we said a year ago, "go far beyond anything in previous history," 259 F.Supp. at 976–977 and see n. 10, Penn-Central will be able to divert a significant amount of traffic during the interim period. The figure of $16,300,000 in revenues, which the Commission estimated Penn-Central might divert from these roads after their inclusion in N & W, when it is no longer shackled by Appendix G, ob-

viously is totally unrelated to what it can divert under the Appendix G traffic conditions. Indeed the contention is in sharp contrast to N & W's claim, discussed above, that these conditions so restrict Penn-Central as to strip the merger of all public interest so long as they exist. There is also the impressive testimony, recounted in our previous opinion, 259 F.Supp. at 977–978, that even apart from the protective conditions, some time would elapse before diversionary effects on the protected roads would occur. This is of particular importance if, as now seems likely, the protected period will be short.

■ We also find no force in N & W's final argument that the order in the merger case was defective because it did not affirmatively find that the only proper home for the three roads is in N & W or N & W–C & O–B & O and not in Penn-Central, but provided instead that the roads might seek inclusion in Penn-Central in certain contingencies. While the Commission's decision in the *Inclusion* case made clear where it thought the proper home to be, 330 I.C.C. at 796, we see no reason why it was bound absolutely to exclude Penn-Central as an alternative, particularly in light of the then existing possibility that refusal of the stockholders of E–L to accept the inclusion terms would prevent inclusion of D & H or B & M in N & W, and the still existing although unlikely one that refusal by D & H's stockholders would prevent inclusion of B & M. N & W is fully protected by its right to oppose inclusion of any of the three roads in Penn-Central.

### Complaint of the Reading.

■ The merger case presents only one more issue that requires discussion, other than that relating to the authorization of immediate consummation which we reserve for the final section of this opinion. Reading complains that it was not allowed to show the injuries it would suffer from the Penn-Central merger as such. It claims that these would be so extensive as to entitle it to protective conditions similar to those provided in Ap-

pendix G for E–L, D & H and B & M, and seeks a remand to that end.

Reading has long been regarded as a "family line" of the B & O, affording along with CNJ that system's access to the metropolitan New York area. Some 38% of its stock is owned by B & O and another 10% is held by Otis & Co. subject to a first refusal by C & O. Five of its eleven directors are B & O nominees, and three other "public" directors were on the management slate. Several of its officers are former B & O employees whose salary continues to be paid by B & O to maintain their pension rights (although B & O is reimbursed by Reading) or hold office jointly in the two roads.

Reading intervened before the Commission in the merger proceeding in August 1962. In April 1963 it advised the Commission that it would not oppose the merger if the Commission would impose standard routing and gateway conditions and PRR was required to divest its holdings in N & W. It introduced no evidence of possible diversion. However, in response to an inquiry from the Commonwealth of Pennsylvania which was conducting an investigation of the effect of the merger on railroads serving the state, the President of the Reading wrote a letter that was subsequently received in evidence. This stated that in 1961 Reading handled a total of 1,116,000 carloads; that 122,000 carloads were interchanged with NYC at Newberry Junction and another 10,000 cars were handled with NYC via an intermediate carrier; that the Reading thought it "possible that as much as 25% of the shipments thus interchanged would be diverted"; [11] and that the study did not include traffic interchanged with PRR since "the Pennsylvania would now be handling it if this were physically feasible." The Examiners found that "the net effect [of the merger] will not be detrimental" to Reading or to its "ability to provide a general transportation service to the public" and

the Commission adopted these findings in its initial report, 327 I.C.C. at 481–82.

After the Commission had issued its Report, Reading sought reconsideration arguing that the finding was inconsistent with another statement of the Examiners that in view of the paucity of evidence they had "no way of assessing the overall implications of the proposed merger" upon Reading; it requested a further hearing to show the adverse effect of the merger in general and also of the Appendix G conditions. The Commission reworded its finding to read that "it has not been shown of record" that the merger would be detrimental to Reading or its "ability to provide a general transportation service to the public," and gave Reading leave to participate in the further hearing as to the effect of the Appendix G conditions, but denied the request to reopen the record to show general adverse effect of the merger. At the further hearing, the Examiners received a Reading exhibit seeking to prove that $3,500,000 of annual revenue would be subject to diversion because of "manipulation" of the Appendix G conditions; but the Commission rejected the conclusion for reasons we have earlier sustained. The Examiners excluded another exhibit purporting to show that up to $19,-900,000 of revenue was subject to diversion as a result of the Penn-Central transaction as such. The Commission affirmed this ruling, holding the Reading to be bound by its "original concession that the effect of the merger transaction (without the indemnity conditions) * * * would be inconsequential." 330 I.C.C. at 357.

We cannot fault the Commission for this ruling. Administrative proceedings, especially of such complexity as this, would never end if parties remained free to take new positions at any time and seek to support them with evidence that had been available all along. See United States v. Northern Pac. Ry., 288 U.S. 490, 494, 53 S.Ct. 406, 77 L.Ed. 914

11. This constitutes 3% of Reading's total carloads. Counsel advised us that Reading would lose $2,700,000 in revenue if its prediction is realized, assuming that the cars diverted yielded average revenues.

(1933); Valley Telecasting Co. v. F. C. C., 118 U.S.App.D.C. 410, 336 F.2d 914, 917 (1964). Reading's reliance on Udall v. F. P. C., 387 U.S. 428, 87 S.Ct. 1712, 18 L.Ed.2d 869 (1967), is misplaced; there the Secretary of the Interior had taken his position from the time the administrative proceeding commenced and submitted his studies as soon as these could be completed. Furthermore, the Secretary of the Interior is an especially important representative of the public—when he speaks others should try to hear him, especially when he speaks on behalf of fish, who have few other spokesmen. While Reading's assertion that the Commission is more than an umpire has its validity, this does not support the conclusion that the Commission is not warranted in taking a railroad at its word or is obliged to reopen a proceeding whenever management has a second thought. Brotherhood of Maintenance of Way Employees v. United States, 221 F. Supp. 19, 28 (E.D.Mich.), aff'd, 375 U.S. 216, 84 S.Ct. 341, 11 L.Ed.2d 270 (1963). Moreover, management's initial conclusion that the effect of the merger would be inconsequential was supported by its own letter to the Commonwealth of Pennsylvania which was in evidence and the new evidence sought to be offered was scarcely persuasive.[12] If Reading's management thought it could safely remain silent since it would be taken care of by its parents although neglecting the opportunity to bind them afforded by the C & O–B & O acquisition, 317 I.C.C. 261 (1962),[13] the Commission was also warranted in thinking so. Indeed it is still exceedingly hard to believe that B & O will see the roads affording it access to the metropolitan New York area disappear, although it naturally will do every-

thing possible to exploit its lack of obligation to include Reading and CNJ in its own system both to minimize their commuter burden and to forward the N. & W–C. & O–B & O merger. If Reading's independent stockholders should ultimately be damaged by action or inaction of management dictated by B & O to further its own interest at the cost of Reading's, they are not without remedy.

## II. THE NEW HAVEN ACTION

In an opinion reported in Oscar Gruss & Son v. United States,. 261 F. Supp. 386 (S.D.N.Y.1966), we dismissed, primarily for lack of standing, the complaints of Oscar Gruss & Son, 66 Civ. 3413, and The New York, New Haven and Hartford Railroad Company First Mortgage 4% Bondholders' Committee, 66 Civ. 3425, to enjoin consummation of the Penn-Central merger until the properties of NH were included therein. Gruss appealed to the Supreme Court but the Committee did not. After reversing our denial of a temporary injunction of the merger in the suits brought by other railroads to that end, Baltimore & Ohio R.R. v. United States, 386 U.S. 372, 87 S.Ct. 1100, 18 L.Ed.2d 159 (1967), the Supreme Court entered an order on Gruss' appeal providing in relevant part as follows:

"Since the order which appellant's suit attacked is now subject to further consideration by the Commission and since proceedings to achieve inclusion of the New Haven are also under way before the Commission, it appears inappropriate to review the decision of the District Court at this time. Rather, we vacate the order of the District Court and remand the case to that

12. This included, in addition to the interchange with NYC, all traffic, whether interline or local, originating or terminating at a place served both by PRR and by Reading. The study did not attempt to estimate how much of the $19,-900,000 of allegedly divertible traffic would in fact be diverted. It admitted, though, that the traffic most likely to be diverted was the traffic exchanged with

NYC at Newberry Junction—the same traffic that Reading's President discussed in his 1962 letter to the Commonwealth of Pennsylvania.

13. Reading has finally sought a commitment for interim aid by a petition for reconsideration in Chesapeake & Ohio Ry. Co.—Control—Western Maryland Ry. Co., 328 I.C.C. 684 (1967), which is still pending.

court. Should appellant still be dissatisfied with the ultimate order of the Commission in the merger proceedings, it may attempt a fresh challenge in the District Court." 386 U.S. 776, 777, 87 S.Ct. 1478 (1967).

After the Commission had rendered its Supplemental Report of June 12, 1967, we gave leave for the filing of supplemental complaints in the Gruss action; these repeated the prayers of the original complaint that consummation of the Penn-Central merger be enjoined pending inclusion of NH. The United States, the Interstate Commerce Commission, the Trustees of NH and PRR and NYC move for dismissal both for lack of standing [14] and on the merits.

While some progress has been made in the direction of inclusion of NH in Penn-Central by sale of its assets, the day of such inclusion is at best some time off. Commission hearings in the inclusion proceeding under § 5(2) of the Interstate Commerce Act have been concluded and the case stands submitted but no report has yet been rendered. As a result of adverse intimations by the Court of Appeals for this Circuit in Matter of New York, New Haven and Hartford Railroad Co. (Chase Manhattan Bank v. Smith) 378 F.2d 635, 638–640 (1967), the NH Trustees have abandoned their proposal to attempt to effect inclusion as a first step in a two-step plan of reorganization under § 77 of the Bankruptcy Act and have proposed a full plan, including provisions for distribution among creditors, which will require approval by the Commission and the reorganization court, submission to creditors, and either approval by them or a determination by the court to utilize the "cram-down" provisions of § 77(e), before inclusion can occur. Beyond all these sources of uncertainty and delay is the possibility, adverted to by the Court of Appeals, 378 F.2d at 639, that lack of action by NH stockholders, who have long since ceased to have any economic interest in the property, might nevertheless prevent inclusion unless the Supreme Court should follow the dissenting views of Mr. Justice Douglas and two other Justices rather than those of the four-man majority in St. Joe Paper Co. v. Atlantic Coast Line, 347 U.S. 298, 74 S.Ct. 574, 98 L.Ed. 710 (1954), or Congress should adopt corrective legislation.

Meanwhile it has become unhappily evident that events will not await the resolution of these issues. Although the NH Trustees had stopped the attrition of cash in 1963 and again, as a result of some $6,000,000 in aid from the states served by NH, in 1966, the loss of cash resumed disastrously in the early months of 1967 and has continued. In an opinion dated July 11, 1967, Judge Anderson found that NH's depletion of cash was "so serious, that if the present rate of loss continues, there will be insufficient left by late September to meet the payroll of approximately $1,400,000 per week," that if the Penn-Central merger "does not become effective shortly after September, the New Haven will be faced with a desperately critical situation," and that "it cannot possibly survive several months of waiting after the Penn-Central merger takes effect to be incorporated into that system." Recognizing the impropriety of the Trustees' taking any action that would be or appear to be a repudiation of the contract which they made with PRR and NYC in good faith, he directed that they "should not oppose the immediate inclusion request by other parties in interest," noted the offer of the Trustee for the First Mortgage Bonds to present the matter to the Commission in its brief in the NH Inclusion Case, and stated his opinion "that it is very much in the interests of the Debtor's estate that this issue be so submitted." Such a suggestion was made not only by the Trustee under the First and Refunding Mortgage but by the trustees under two other mortgages, Gruss, the Committee, and the states of New York,

---

14. They contend further that the Committee, which had also intervened as a plaintiff in the Gruss action, is barred by virtue of its failure to appeal from our previous judgment of dismissal.

Connecticut, Rhode Island and Massachusetts.

The Commission reacted with speed. By order served August 3, 1967, it directed the NH Trustees to negotiate a lease of NH with PRR and NYC to be "immediately available upon consummation of the Penn-Central merger"; the order also stated "that it would be inequitable during the lease period to place the entire burden of the NH operating deficit upon Penn-Central, and that consideration should be given to devising terms which would equitably distribute such burden." The agreement or proposals therefor were to be submitted within 30 days, and consummation of the merger would constitute irrevocable assent to a lease prescribed by the Commission subject to judicial review of any decision as to the effect of operations thereunder on the inclusion terms. On September 1 the NH Trustees on the one hand and PRR-NYC on the other reported that it would be impossible to prepare a lease and have this made effective in time to meet NH's desperate needs; they submitted as an alternative proposal that immediately upon consummation Penn-Central would commit itself to purchase up to $25,000,-000 of Trustees' Certificates over a period of three years. The proposal of PRR and NYC was that certificates so purchased could be tendered as part of the purchase price of NH; the Trustees' proposal was that upon the closing of the purchase Penn-Central should pay an amount equal to NH's Adjusted Net Deficit for the period subsequent to consummation of the merger.[15] By order

served September 12, 1967, the Commission took note of these submissions, directed a hearing on September 25, 1967, to enable it to determine "(1) whether a lease agreement, a loan arrangement, or other alternatives afford the most suitable means of assuring the continuation of the NH's operations until the NH assets can be transferred to the ownership of Penn-Central, and (2) equitable terms for the arrangement adopted," dispensed with an examiner's report, and broadened the condition clause of its August 3 order so that consummation of the merger would constitute an irrevocable assent of Penn-Central "to lease the NH or enter into a loan or other appropriate arrangement with the NH for continuation of the NH's operations under such just, reasonable and equitable terms as the Commission may require," subject again to judicial review.

The parties are in sharp disagreement whether the Supreme Court disapproved our holding on the plaintiffs' lack of standing. There is little profit in an extended attempt at exegesis; the extracts from the briefs before the Court which have been submitted to us add nothing to the words of the short opinion. Our inclination is to take the Court's statement, "it appears inappropriate to review the decision of the District Court at this time," as meaning what it says. The Court seems to us to have deferred decision on a difficult question of standing which it thought might become academic in view of the remand to the Commission directed in the *Baltimore & Ohio* suit or of the New Haven inclusion pro-

---

15. Adjusted Net Deficit is any red figure resulting from the following adjustment of NH's net railway operating income: Income would be increased by adding NH's income under the Grand Central Terminal Agreements to the extent recognized by NYC, and any deficiency in public assistance below current levels. Expenses would be decreased by deducting depreciation charged to railway operating income (other than depreciation which § 9.14 of the Purchase Agreement requires to be deducted from the purchase price) but would be increased by adding fixed charges for rent for

leased roads and funded and unfunded debt not in default. The submission of the NH Trustees reports that the deficit in net railway operating income does not take account of unpaid operating costs, aggregating some $5,000,000 in 1966, representing deferred real estate taxes, per diem in controversy, and unpaid tort claim obligations. Under its proposal these would be a charge against creditors. The Trustees' Certificates held by Penn-Central would be offset against the amount of Penn-Central bonds otherwise required to be issued on the closing.

ceeding; if this proved not to be so, it wished us to reconsider the question in the light of subsequent developments. While we entertain no doubt as to the correctness of our decision of last fall as the case then stood, we recognized that matters would appear differently if the reorganization court found that the NH Trustees, even though acting in the best of faith, had disabled themselves from properly representing the estate on a certain issue, 261 F.Supp. at 394. Judge Anderson's order of July 11, 1967, did something along these lines; we think it plain that the Trustee under the First and Refunding Mortgage would have had standing if the Commission had taken no heed of its lease proposal. Although it can be argued that the court's order went no further than that, we take a broader view—particularly in view of the explanation by the Trustee under the First Mortgage Bonds at the argument before us that its failure to institute legal action was due to its belief that the plaintiffs were effectively representing the bondholders.[16] Similarly, what we previously said with respect to untimeliness, 261 F.Supp. at 394–395, is to some extent inapplicable in light of the changed economic position of the NH and the proceedings we have just recited.

Insofar as the complaints seek to enjoin consummation of the merger pending inclusion of the properties of NH by way of sale, they are sufficiently answered by Judge Anderson's order of July 11. In his view any substantial postponement of consummation means speedy death for the New Haven; hope lies rather in early consummation subject to a commitment that will fairly assure continued operation while the administrative and judicial mills continue their painfully slow grind. In its order of August 3, 1967, the Commission reiterated its conclusion that contentions "that there are possible solutions to the NH problem other than inclusion in Penn-Central are without merit," and at the argument before us Gruss' counsel conceded that the only alternative to inclusion in Penn-Central is liquidation. While the Committee holds out the possibility of condemnation by the four states served by NH, wishful thinking will not meet imminent payrolls.

Indeed, the plaintiffs now appear to recognize that injunction of consummation pending purchase would mean a cessation of operations by NH, and would be satisfied to have us permit consummation if this were conditioned on a lease wherein Penn-Central would shoulder all operating losses, whether or not caused by the merger, until NH either was included or ceased to run. Penn-Central is understandably unwilling voluntarily to go so far, although under the Commission's order of September 12 the companies by consummating the merger take the risk, subject only to the safeguard of judicial review, that they may be compelled to do just that. *Per contra,* if the Commission's order should prove unsatisfactory to the plaintiffs, they too will be entitled to seek review. What is urgent to avoid cessation of NH's vital service are (1) early consummation of the Penn-Central merger and (2) a Commission order prescribing some form of financial aid that will permit the NH's operations to continue beyond December 31, 1967, when, as the NH Trustees now advise, their cash available for operations will be exhausted. The Commission has given every indication of its intention to do precisely that. To be sure we are confronted, as we were a year ago, with a condition that is not in all respects complete, although far more nearly so than the Appendix G conditions as they then stood. But with the situation now so serious, there can hardly be doubt that it is better to accept what is good for the New Haven than permit the patient to die while in quest of the best.

16. We find no force in the argument that the standard "no-action" clause in the First and Refunding Mortgage Indenture bars action by a bondholder or a bondholders' committee. The clause applies only to suits "for the foreclosure of this Indenture, or for the execution of a receiver, or for any other remedy hereunder * * *." Moreover, even if the clause were applicable, the Trustee appears to have waived it.

The remaining point is the Committee's contention that at the very least NH should have the benefit of Appendix G conditions. In our previous opinion we outlined why the Commission could well have considered these to be unnecessary or inappropriate, 261 F.Supp. at 389–391. The unlikelihood that Penn-Central would avail itself of its opportunities for diversion from NH in the interval prior to inclusion would be heightened if it is now required to bear or share in operating losses. Moreover, we are told that the issue of financial indemnity conditions is under advisement by the Commission in the NH Inclusion case; the Commission thus has power to include such conditions and plaintiffs can seek review if it does not. While such conditions would become effective only in the event of NH's ultimate inclusion and in practical terms would thus simply produce an addition to the purchase price, it is likely, if not indeed certain, that only in the event of inclusion will there be a New Haven operation; we find nothing in the Interstate Commerce Act that would compel the Commission to require an operating railroad such as Penn-Central to reimburse creditors of a defunct one for losses due to merger diversion. Particularly in view of the failure to raise the issue of protective conditions at an earlier date, see 261 F.Supp. at 391 n. 3 and 394–395, we decline to direct the Commission to modify the order authorizing the merger so as to include them.

We therefore dismiss the complaint without prejudice to any relief plaintiffs may be advised to seek as a result of the Commission's decision in the proceeding initiated by its orders of August 3 and September 12, 1967, or of its order in the NH Inclusion case.

III. THE N & W INCLUSION ACTION

■■■■■ No substantial attack is made on the Commission's basic finding, as set forth under the headings "Public Interest," 330 I.C.C. at 784–89, "Advantages to N & W," 330 I.C.C. at 792–93, "Advantages to petitioners and to the public," 330 I.C.C. at 794–95, and "Competitive effects," 330 I.C.C. at 795–96, that inclusion of E–L, D & H and B & M in the N & W system on proper terms is in the public interest. No carrier not a party to the inclusion contends in this court that it will be adversely affected or requires additional conditions for its protection. Only two points come even close to the larger public interest in the transaction, and little discussion is needed to show their lack of merit. *First,* N & W complains that the Commission should have considered the desirability of including the three roads along with Reading and CNJ as wholly owned subsidiaries in a larger N & W–B & O–C & O System (the so-called DERECO plan). The Commission was justified in refusing to do this. Such a course would have frustrated the expeditious decision in the instant case envisioned by the Supreme Court, 386 U.S. at 392, 87 S.Ct. 1100, since hearings on the N & W–B & O–C & O proposal were still in progress. On the other hand, nothing here decided by the Commission would block subsequent consideration of the larger proposal. *Second,* N & W would have us fault the Commission for failing to find that inclusion of any of the three roads in Penn-Central would not be in the public interest. The Commission did find "that inclusion of the petitioners in the N & W system is preferable to their inclusion in the Penn-Central." 330 I.C.C. at 796. That was the most that was required; apart from what we have said concerning a similar contention in the merger actions, the negative determination sought by N & W was not within the issues of the *Inclusion* case.

With respect to the terms N & W alleges numerous errors in favor of the included lines, while B & M claims the price fixed for it is too low. Insurance companies holding some $30 million of E–L bonds contend that the order will permit dilution of the security for their mortgages and impair or prevent the payment of interest particularly on income bonds. On the other hand, E–L and D & H are now satisfied with the terms, which E–L's stockholders have already accepted and D & H's board of directors has unanimously voted to recommend.

We note at the outset that the scope of our review of an order prescribing such terms is limited. This court has said that "Because of the broad authority conferred upon the Commission by § 5 of the Interstate Commerce Act and the technical complexities of a merger case, the doctrine of administrative finality is particularly applicable." Friedman v. United States, D.C., 168 F.Supp. 815, 818 (1958). Relevant also is this court's statement in Stott v. United States, D.C., 166 F.Supp. 851, 857 (1958), that on such matters we are not permitted to substitute our own judgment for that of the agency, or consider the expediency or wisdom of its decision, or whether on like testimony we would have made a similar ruling.

### Employee Protective Conditions.

N & W's objections to the employee protective conditions, 330 I.C.C. at 822–26, fall as soon as this limitation on our power is recognized. The Commission noted that in the earlier phase of this proceeding N & W had entered into agreements with many labor unions providing that job elimination resulting from absorption of the Nickel Plate, the Wabash and other carriers would be accomplished only through normal attrition; these agreements were later modified to prohibit the transfer of employees beyond their general locality. For other employees the Commission had then prescribed conditions in line with its general practice, 324 I.C.C. at 50. Here the Commission prescribed the same conditions— either N & W's existing contracts were to be modified to take in employees of the included roads or similar new agreements were to be written; if no agreement was concluded within 60 days, the Commission would prescribe appropriate conditions.

The Commission acted within its powers in requiring N & W to protect employees of the three roads as thoroughly as those of the roads it was permitted to absorb only on the condition that it would accept these lines if the Commission so directed. It is no matter that as late as Erie R. Co. Merger, 312 I.C.C. 185, 196 (1960), sustained in Brotherhood of Maintenance of Way Employees v. United States, 366 U.S. 169, 81 S.Ct. 913, 6 L.Ed.2d 206 (1961), and Atchison, T. & S. F. Ry. Co. Merger, 324 I.C.C. 254, 261 (1965), the Commission had rejected attrition conditions upon finding they would merely "preserve unneeded jobs." If the Commission believes more liberal protection against the effects of inclusion is appropriate either in general or, as here, on the facts of a particular case, that is a policy matter which Congress left for it to decide. Moreover the record strongly indicates that the attrition condition will not significantly affect the savings contemplated from the inclusion of the three roads simply as wholly owned subsidiaries, 333 I.C.C. at 823–24. While there is more merit to N & W's contention that the protection should not extend to job reductions from causes other than inclusion, the Commission's decision that employees of the three roads should be treated in the same way N & W had agreed to treat its present employees has a sufficient basis in reason that we cannot properly upset it; and although N & W is correct that the figures at 330 I.C.C. 824 do not include job eliminations from other causes, it presented no evidence as to what these would be or that they would constitute a serious burden. Finally we reject N & W's objection to the imposition of a "job freeze" during the 60-day period allowed for working out an agreement or, failing that, a Commission decision, which should be speedily forthcoming. N & W would scarcely be making extensive work reassignments in this brief interval, and we see no basis for its fears that the freeze would continue during possible litigation over a Commission decision allowing work reassignments.

### The Commission's General Standard and Method of Valuation and N & W's Criticisms.

As this is the first case in which the Commission has fixed an equitable purchase price under § 5(2) (d), it properly

sought to elucidate the standard that should govern its action. It held that it was "not required to find that N & W benefits affirmatively and financially under the terms of inclusion," that N & W would have no legitimate complaint if the terms "will have a neutral effect on the N & W stockholders, neither diverting any funds from such stockholders to petitioners' stockholders nor in any other way diluting the present holdings of the N & W stockholders," and that "the inclusion of petitioners on terms fully recognizing their benefit to the N & W system is also equitable to petitioners since it attributes to them earnings not obtainable by them as independents." 330 I.C.C. at 801–02.

 N & W's claim that benefits of the inclusion must be equally divided between each included road and itself forget the purpose of § 5(2) (d) and the wide latitude accorded the Commission in carrying it out. This section, enacted as part of the Transportation Act of 1940, 54 Stat. 906, is but the latest in a series of enactments going back to the "recapture" clause of Transportation Act, 1920, 41 Stat. 489–491, whereby Congress has attempted in one way or another to require stronger railroads to help carry some weaker ones. Recognizing that voluntary consolidation would include only the more desirable candidates and would leave the weaker brethren to languish, Congress authorized the Commission to condition permission to consolidate on the inclusion of undesired lines. This authority was not limited to railroads that were harmed by the merger; Congress gave the Commission a power it could utilize to establish a sound railroad struc-

ture. The Commission was thus entirely justified in holding there was no basis for complaint by the acquiring road so long as the forced inclusion did not diminish the benefits of the consolidation to which it was attached as a condition. Indeed, although we find it unnecessary so to decide, it may well be that, as the Commission intimated, 330 I.C.C. at 802, it could lawfully invade the benefits of the prior consolidation on a showing that inclusion was required by the public interest and that allocating some of such benefits to the owners of the additional roads was the only way of meeting their reasonable expectations, perhaps based on possible inclusion in another system that would be less in the public interest.[17] While N & W cites decisions where the Commission has divided benefits in approving the fairness of consensual arrangements,[18] the Commission did not say in these cases that a basis more favorable to the weaker road would be inequitable. Apart from the limited scope of *stare decisis* to administrative determination of policy issues, see Pinellas Broadcasting Co. v. FCC, 97 U.S.App.D.C. 236, 230 F.2d 204, 206, cert. denied, 350 U.S. 1007, 76 S.Ct. 650, 100 L.Ed. 869 (1956), these decisions did not bind the Commission to follow a similar practice when fixing equitable terms for involuntary acquisitions under § 5(2) (d) and, in accepting the "Appendix O" conditions to its merger, 324 I.C.C. at 148, N & W had no sufficient basis for assuming that they did.

Having thus established the ground rules, the Commission next had to determine the corporate method by which inclusion of the three roads should be ef-

---

17. If the line promoting the consolidation did not wish to go through with it under such a condition, it could of course refuse. Compare Atlantic Coast Line R.R. v. United States, 284 U.S. 288, 52 S.Ct. 171, 76 L.Ed. 298 (1932). No different result would be demanded because, as here, a carrier had elected to consummate an acquisition and begun to enjoy its benefits subject to the Commission later fixing equitable terms for the inclusion of other carriers.

18. This was the situation in Louisville & N. R. Co. Merger, 295 I.C.C. 457, 497

(1957); Norfolk & Western-Merger-Virginian, 307 I.C.C. 401, 430 (1959); and Seaboard Air Line R. Co.-Merger-Atlantic Coast Line, 320 I.C.C. 122, 157, 192 (1963). In Florida East Coast R. Co. Reorganization, 282 I.C.C. 81 (1951), also cited in N & W's brief, the Commission, before approving a reorganization plan submitted by the Atlantic Coast Line for a merger with the debtor, insisted that the debtor be credited with half the prospective merger savings, 282 I.C.C. at 159–60.

fected. Although merger would maximize both economies and traffic gains, the Commission found merger would be unfair to N & W in the cases of E–L and B & M because of their heavy debt and, in the latter instance, large early maturities. While there were no similar obstacles to a merger of D & H, N & W objected to acquiring that company's excess working capital and D & H took the position, which the Commission accepted, that if it had to retain this, it was entitled to sell its operating assets on a taxable basis that would produce an immediate refund of some $4,500,000 and large credits against the income D & H expects to realize from retention of the excess working capital.

 Under the plan prescribed by the Commission E–L and B & M are to convey their assets, subject to existing indebtedness, to new subsidiaries all of whose common shares will be owned by another subsidiary, NC, whose common stock will be owned by N & W; the shareholders of the two companies would then receive preferred stock of NC convertible into N & W common on a share for share basis at the end of five years or sooner if Congress should enact legislation (the Keogh bill) which would give N & W the benefit of these carriers' loss carry-forwards. D & H is also to sell its assets other than excess working capital, subject to existing indebtedness, to a N & W subsidiary which is to pay in cash[19] or, at its option, in a note and N & W stock as explained below. This plan of incorporating the three companies as subsidiaries necessarily results in underestimating the benefits of inclusion if N & W's resourceful management should ultimately find it possible to work out arrangements with bondholders that would permit merger and thereby obtain freedom to deal with the personnel and properties of N & W and the included roads as a single entity.

 The process followed by the Commission in setting the price was broadly this: It first established for each of the three roads a normalized year's income unaffected either by inclusion in N & W or by the Penn-Central merger. It then added the benefits the road would obtain from inclusion in N & W both by saving expenses and by gains from existing traffic rerouted by some element of the future N & W–E–L– D & H–B & M system so as to produce the longest system haul.[20] Next the

---

19. N & W objects that the Commission did not also fix cash prices for E–L and B & M. N & W did not raise the issue until its exceptions to the report of Commissioner Webb as hearing examiner. The Commission was not bound to fix such a price, especially if, as it thought, 330 I.C.C. at 818, 331 I.C.C. at 29, 30, savings and traffic gains resulting from inclusion should not be considered on that alternative, see fn. 22.

20. These gains were estimated as follows, 330 I.C.C. at 804, 834:

| Line | | Gain in gross revenues through N & W's efforts (1) | Gain in gross revenues through all carriers' efforts (2) |
|---|---|---|---|
| 1 | N & W | ——— | $ 4.62 |
| 2 | E–L | $ 2.8 | 4.33 |
| 3 | D & H | 1.4 | 2.13 |
| 4 | B & M | 1.6 | 1.72 |
| | | $ 5.8 | $12.80 |

The figure in Line 1, column (2), was not utilized in adjusting the income of the three roads. N & W contends that the figures in column (1) are excessive by $1.16 million. The argument concerns the extent to which the results of N & W's rerouting efforts would approach petitioners'. Commissioner Webb gave N & W's contention sufficient weight when he credited it with only $5.8 million gain, derived from witness Wyer's survey (E–L Exhibit 99), rather than the full $7.0 million which was the sum of line 7, columns 1–3, 330 I.C.C. at 834, as had been claimed.

Commission sought to satisfy itself that any traffic losses the three roads would suffer to Penn-Central would be offset by other benefits to N & W not already taken into account. It then established for E–L and B & M a ratio between the adjusted net income per share of the included road for the period utilized and that of N & W for the year ending June 30, 1966, the latter being adjusted upward for yet unrealized net savings from N & W's previous merger. Finally it established exchange ratios for these roads which took account not only of these earnings ratios but of all other relevant factors. Thus, while the earnings ratio for E–L was .172 to 1, the Commission set a lower exchange ratio of .128 to 1 which E–L's financial consultant had regarded as fair and equitable.[21] For B & M the earnings ratios were .126 per common share and .220 per preferred share; the Commission reduced these to exchange ratios of .10 and .175. In fixing a cash price for the sale of all assets of D & H except excess working capital, the Commission capitalized at 8.3% the adjusted income available for fixed charges other than income on the excess working capital, inclusion savings and traffic gains; from this it deducted the long term debt and a $4,500,000 tax refund expected to be immediately received by D & H and arrived at a cash price of $41,211,000.[22]

N & W attacks almost every step in this process. To begin with, it objects to the Commission's using as a base for computation the D & H and B & M earnings for 1965 adjusted, in a manner proposed by petitioners' witness Wyer and revised by N & W's witness Brinner, to eliminate nonrecurring items and reflect on a full year basis operational changes effective for only part of 1965 (the so-called "Wyer-Brinner adjustments"). N & W says that since 1966 results are now available—and are lower than the adjusted figures—the Commission was bound to use them, especially since it used an average of 1965–66 earnings as a base for E–L and earnings for the year ended June 30, 1966 as a base for N & W. It also calls attention to the decline in E–L earnings during 1967.

As the hearing before Commissioner Webb began on April 20 and ended on August 10, 1966, results for 1966 were not available; indeed when the hearing began, the latest figures that had been available to Wyer were for the 12 months ended October 31, 1965, and Brinner's revisions were designed to take account of the full year 1965 rather than the earlier 12 months Wyer had used. The hearing examiner and the Commission having properly used 1965 figures, they were not required to start anew when the 1966 figures for D & H and B & M became a part of the record as a result of stipulation of the carriers' Form A reports. These are simply raw figures which have not been analyzed to remove extraordinary items or to place others on a full year basis; by the time the experts could do that and the Commission could render a new report, 1967 figures would be available and, on N & W's argument, the process must start again. The law does not compel an infinite regress. Indeed, N & W's present insistence on the importance of the newest data contrasts sharply with the position it took before the Commission as to the appropriate base period for valuing E–L. When Commissioner Webb used the most recent data then available—the reported

21. The downward adjustment takes account of the lower "quality of E–L's earnings, where, on 1965 figures, only 6¢ per dollar of railway operating revenues were available for fixed charges as against 26¢ for N & W, 330 I.C.C. at 808, making E–L more vulnerable to decreased revenues or increased expenses.

22. N & W was given an option to make the purchase with a $1,000,000 five year 6% note plus 412,627 shares of N & W stock valued at the current market value of $105 per share, or a total of $44,325,-855. The cash price for D & H is $3 million lower than the stock price, because, in reaching the cash price, D & H's earnings were adjusted to eliminate control savings and traffic gains, to which the Commission felt the D & H stockholders would not be entitled in a cash transaction since they would not bear the risks of the new enterprise.

income available for fixed charges for the year ending June 30, 1966—to reflect E–L's continuing efficiency program, N & W objected and, on its exception, the Commission used a lower figure representing the adjusted average for 1965 and 1966. And the Commission's use of N & W's adjusted income for the year ended June 30, 1966 rather than the lower figure for 1965, compare 330 I.C.C. 816 and 881, is surely not something of which N & W can fairly complain. While the Commission was at liberty to consider the more recent figures, it was not bound to do so.

N & W argues further that if 1965 figures were to be used, they should not have been adjusted as Wyer proposed since his adjustments "reflect only the ordinary operational changes which are constantly occurring on any railroad and as to which *no* adjustment need be made." This same argument was made before the Commission, and the agency, in the exercise of its expert judgment, rejected it. N & W has not analyzed Wyer's calculations in detail to show that the Commission's decision was arbitrary. Its only specific grievance goes to the Commission's failure to consider the significance of the substantial wage increase granted to B & M employees one day after the base period's end. It argues that many of the efficiencies B & M had introduced in 1965 were offset by this increase. But the Commission found that the wage increase did not undermine its conclusions based on the year ending December 31, 1965. It noted "that in the past B & M has demonstrated an ability to offset wage increases by improved efficiency, and conclude[d] that this ability should only be heightened after inclusion in the N & W system." 330 I.C.C. at 820. This seems an adequate answer. Of course, to determine accurately whether the wage increase was offset, one would have to study the further efficiencies B & M instituted during 1966. But this detailed study, as we have just explained, was not required.

N & W next contends that the adjusted income of E–L and B & M should be adjusted downward for undermaintenance. The subject also is one where deference is owed to the Commission's expertise, and we are content to rest on its discussion, 330 I.C.C. at 809–11 and 858–65, and the related portions of Commissioner Webb's report, which demonstrate substantial evidence to support the Commission's refusal to make the requested adjustment.

In a third argument directed at the pre-inclusion earnings N & W asserts "there is no evidence to support the Commission's finding that E–L will have $7.5 millions of earnings attributable to relief from the commuter burden." [23] The $7.5 million figure is made up of the following items:

In Millions

1. Exemption of passenger service facilities from property taxation ............................................. $0.7
2. Discontinuances already authorized by N. J. Board of Public Utility Commissioners .......................... 2.0
3. N. J. property tax reduction ........................... 1.3
4. Assistance payments .................................. 3.5

$7.5

23. The adjustment appearing in the report is $6.8 million, 330 I.C.C. at 813, which, however, reflects the receipt during the test period of part of the estimated $1.3 million reduction in New Jersey property taxes.

Since the first three are already in hand,[24] the argument boils down to the point that when the record closed, no contract for future assistance payments had been signed and that in any event these cannot be counted on since they depend on annual appropriations by the legislature.

Here again N & W is insisting on a degree of certainty beyond the capacity of an expert agency forecasting earnings; the Commission had to make the best estimate of future New Jersey assistance payments that available material permitted. In 1965 E–L received $3.4 million and a witness for the State of New Jersey testified that the new contract then being negotiated would pay about $3.5. N & W does not contend that post-hearing events have belied this estimate. To be sure payments under the new contract are contingent upon annual appropriations by the legislature, but if that kind of uncertainty prevented reasonable prediction, the conduct of business would be impossible. The Commission's estimate was surely more accurate than one that ignored the assistance payments altogether.

*Effect of the Penn-Central Merger.*

N & W mounts a heavy attack on the Commission's conclusion that "since the petitioners' traffic losses to Penn-Central are fully offset by traffic savings and additions to N & W resulting from inclusion, those traffic losses do not adversely and materially affect petitioners' value and should be disregarded in the computation of exchange prices." 330 I.C.C. at 809.

We begin with some general observations. Commissioner Webb, who had presided at the hearing, refused to reduce petitioners' net income on account of anticipated losses to Penn-Central, in part on what seems to us the wholly reasonable ground of N & W's failure to introduce detailed evidence as to the losses it would suffer, 330 I.C.C. at 802. How-

ever, he also declined to credit the three roads with any of the anticipated gains from rerouting of traffic to provide the longest system haul. Rightly believing that the second of the two rulings prejudiced petitioners, the Commission upset both. We fail to understand why the two issues had to stand or fall together. N & W manifestly was not entitled to compare its own earnings unreduced by Penn-Central losses to petitioners' earnings so reduced.

We also do not accept N & W's premise that the Commission was bound to discount petitioners' earnings for traffic losses to Penn-Central. Our position rests not on the broad view sketched above, see text accompanying fn. 17, but on considerations relating to this particular case. If N & W had been required to include petitioners before completing its merger with the Nickel Plate and the Wabash in 1964, the three lines would have been entitled to credit for the traffic gains through rerouting but would hardly have been subjected to a penalty for losses arising from the contingency of a future Penn-Central merger. The Commission permitted consummation of the earlier consolidation without inclusion of E–L partly because the parties asked to be permitted "to resolve the problems between them in due course of time", 324 I.C.C. at 22, in voluntary negotiations. These having failed, N & W should stand no better because it chose to complete its merger, which promised annual savings of $29,000,000, on condition that it would include the lines later if the Commission directed. Moreover, as Commissioner (now Chairman) Tucker pointed out in his dissenting expression in the N & W merger case, 324 I.C.C. at 57–60, and his concurrence in the Penn-Central merger case, 327 I.C.C. at 549, the N & W merger, along with the previous C & O–B & O unification, 317 I.C.C. 261 (1962), gave strong impetus to a Penn-Central merger. In approving the latter the Commission stressed "that ap-

24. N & W argues that there was no substantial evidence supporting the amount of the second item. The savings estimate was made by the New Jersey Board of Public Utility Commissioners, and the Commission was justified in relying on it.

plicants will face increasing competition from those two greatly strengthened rail systems." 327 I.C.C. at 519. We see scant equity in allowing N & W to discount petitioners' earnings for all losses due to an event which it must have recognized as highly likely when it accepted the "Appendix O" conditions and to which its own merger had led in considerable measure.[25] It is no matter that, as N & W urges, its merger did not itself damage petitioners. Neither is it decisive that N & W was controlled by PRR at the time; it sought the merger as a corporation and has derived large benefits from it. If petitioners' losses to Penn-Central are to be taken into account at all, N & W could fairly be asked to bear at least some share—at minimum, for example, the amount of traffic it has already gained by diversion from petitioners or Penn-Central as a result of its merger. We stress this both to avoid future misunderstanding and to indicate that the Commission approached the problem of losses to Penn-Central on a basis considerably more favorable to N & W than we believe was required; we do not, however, rely on it as a ground for our decision.

Finally we emphasize that the figures detailing the estimated losses to Penn-Central which have been so heatedly debated are infected with the "delusive exactness" that Mr. Justice Holmes, speaking in a different context, characterized as "a source of fallacy throughout the law." Truax v. Corrigan, 257 U.S. 312, 342, 42 S.Ct. 124, 133, 66 L.Ed. 254

(1921). The estimate that petitioners, after inclusion in N & W would lose $16.34 million of freight revenues to Penn-Central [26] rested primarily on an N & W study of their traffic for the twelve months ended July 1965. Thousands of samples were subjected to examination and a judgment made as to the percentage of each that would be diverted. While Commissioner Webb reduced certain items, he accepted the bulk of the study although noting its infirmities, since he had given petitioners the benefit of the doubt on their rerouting studies. It is not apparent to us that the two matters were *in pari materia*. Petitioners' studies, supervised by an independent expert, involved a judgment of how they could reroute traffic they were already handling; N & W did not make a separate study but rather restructured the petitioners' data—which originally was designed to show traffic gains—and made conclusions as to how much petitioners would lose to a different railroad. Yet no matter how often the Commission repeated that such figures were "approximations" or "rough estimates," see 330 I.C.C. at 806, the craving of the human mind for a certainty that is unattainable tends to crystallize them into a sharpness that is not there. As Mr. Justice Cardozo pertinently observed, "An intelligent estimate of probable future values, and even indeed of present ones, is at best an approximation. The like is true of a forecast of future revenues. There is left in every case a reasonable margin of fluctuation and uncertainty." Dayton

25. Evidently Commissioner Webb had something of this sort in mind when he said: "If the inclusion of EL, D & H, and B & M in either the N & W system or the Penn-Central system is practically assured, their inclusion in the system chosen by the Commission in the furtherance of national transportation objectives should not be on terms which reflect any diminution of capital value attributable to the traffic diversion impact of the other system. In other words, the petitioners should not be penalized for anticipating the Commission's desire to preserve rail competition in the territory they serve." Report, p. 28.

26. The figures as adjusted by Commissioner Webb broke down as follows:

| | Millions |
|-------|----------|
| E–L | $11.37 |
| D & H | 3.08 |
| B & M | 1.89 |
| | $16.34 |

330 I.C.C. at 806.

Power & Light Co. v. Public Utility Comm'n, 292 U.S. 290, 310, 54 S.Ct. 647, 656, 78 L.Ed. 1267 (1934).

N & W conceded that the Penn-Central merger would adversely affect its own traffic and that petitioners' inclusion would have "some effect" in protecting it. However, while it made the detailed study of petitioners' losses we have just described, it made no similar study of its own losses to Penn-Central or of the extent to which petitioners' inclusion would assist it in reducing them. No one else was in a position to do this, especially in view of N & W's failure to furnish even the detailed break-down of its interline revenues for which Commissioner Webb had called at the prehearing conference. Faced with this impasse, the Commission attempted to assess the assistance the three roads would render as best it could.

N & W had estimated that if the three roads were included in Penn-Central, its maximum loss would be $22 million.[27] Since the Commission found that inclusion of the petitioners would strengthen N & W, it concluded that, without petitioners, N & W would have a greater loss to Penn-Central and undertook to "determine how much greater and whether the further loss would be as great as" the $16.3 million which N & W estimated the three roads would lose to Penn-Central, 330 I.C.C. at 807. Simply for purposes of illustration it added the $16.3 million to the $22 million, yielding a total of $38.3 million. It then considered whether, without the three roads, N & W "could lose (or fail to gain) up to a total of $38.3 million of its revenues in competition with Penn-Central or 6 percent of N & W's annual gross revenues of $600 million," 330 I.C.C. at 807. The Commission found it reasonable to believe that N & W's losses without peti-

tioners could reach such an amount and that their addition would thus save it as much traffic as they would lose. N & W protests that no evidence in the record supports the conclusion that without petitioners' help it would lose 6% of its revenues. We would agree that, taking account of the location of the two systems and the nature of N & W's historic traffic, the figure seems high, at least in relation to the 5.6% estimated diversion from the petitioners who are more exposed to Penn-Central competition and the 5.3% estimated diversion of N & W's revenues from interline traffic with them, although, as the Commission indicated, N & W's traffic witness declined to testify that the adverse impact of the Penn-Central merger on it would be less than on petitioners, saying rather "I can't state a relative opinion on that question. The three petitioners would be hurt and so would the N & W system." 330 I.C.C. at 805.[28] But if the Commission's minuend of $38.3 million may well be too high, so is the subtrahend since, as the Commission noted, 330 I.C.C. at 807 fn. 15 and 808, the $22 million was a maximum estimate and a high one for the very reason just indicated. The Commission was not compelled to accept N & W's response that petitioners can assist only as to traffic on which they "have a handle," namely, the $36.6 million of N & W traffic in which they participate. Petitioners can help N & W not only with respect to interline traffic they now carry with it but whenever their inclusion will enable N & W to compete with Penn-Central more effectively. In view of N & W's failure to submit the detailed breakdown of its traffic necessary for a more nearly accurate judgment of the help petitioners could render, the Commission was war-

27. This figure was obtained by applying the percentage of N & W's interline revenues with petitioners which N & W had estimated would be diverted, to wit 5.3%, to N & W's total interline traffic of $413 million.

28. The witness first testified that inclusion of petitioners would not protect any N & W freight revenues that would oth-

erwise be lost to Penn-Central. However, he conceded in response to Commissioner Webb's questions that he had not made a detailed estimate of the extent of N & W's losses to Penn-Central and admitted on cross-examination that his discussion had been very incomplete and that petitioners' inclusion would yield "some" service benefits.

ranted in proceeding as it did. Similarly, while the methodology of a second and lower estimate of a $9.5 million saving, 330 I.C.C. 805 & fn. 12, was faulty as the Commission recognized, the end result, that inclusion of petitioners might save N & W against Penn-Central diversion some 1.6% of its total freight revenues or 2.3% of its interline freight revenues, is not so clearly unreasonable as to invite judicial condemnation, at least when no better figures were available.

Furthermore the Commission properly did not consider itself obliged to find that the entire $16.34 million of petitioners' estimated losses to Penn-Central would be offset by N & W savings of this one type. It credited the three roads with the $4.62 million in added N & W revenue resulting from petitioners' re-routing traffic to provide the longest system haul, line 1, column (2), in the table reproduced in fn. 20, which had not been allocated to any of the three lines. It also took account of what it thought would be "the greatest single gain for N & W," namely, "its enhanced ability to obtain *new traffic* over and above the rerouting traffic in competition with Penn-Central and other modes of transportation," 330 I.C.C. at 805;[29] E–L's inclusion, for example, would permit N & W to gain "several million" dollars in new revenue by providing single line

service to New York City. 330 I.C.C. at 806. N & W is mistaken in asserting that this double-counts the traffic already used to increase petitioners' revenues; the Commission's report is clear that those figures included only traffic N & W or the petitioners "now handle at least in part," 330 I.C.C. at 803.[30] Moreover, a buyer in N & W's position would consider not only the extent to which the petitioners could strengthen its competitive position upon inclusion, but also the damage they could do if negotiations were to fail and they were to remain independent or ultimately be allowed to join the Penn-Central system. While the Commission found that the three roads would have no incentive to divert N & W traffic during the protected period because, among other reasons, "they expect to become affiliates of N & W, and could not afford to take traffic from that system" 330 I.C.C. at 355, the situation would be quite different if petitioners were to believe they might become or in fact did become permanent parts of Penn-Central.[31] When all these elements are considered, the Commission's conclusion, 330 I.C.C. at 809, quoted at the outset of this discussion, is plainly rational. What is demanded is substantial evidence to support the agency's ultimate finding, not logical perfection in every step.[32]

29. This was not limited to $2.2 million as N & W claims.

30. The passages from Commissioner Webb's report cited by N & W to support its contention of double-counting did refer to new traffic as one of the several reasons for giving the petitioners' rerouting studies the benefit of the doubt. But he more than offset any advantage that decision afforded the three roads by giving N & W the benefit of the doubt when calculating their losses to Penn-Central. 330 I.C.C. at 836–38.

31. E–L's brief cites in this connection that N & W's study showed N & W revenues of $10.46 million from traffic originated or terminated by petitioners and handled by N & W as an intermediate carrier; in a comparable situation where N & W was an intermediate carrier on traffic

originated or terminated by NH, it estimated 48.1% diversion from NH's inclusion in Penn-Central. An additional $13.19 million of the $36.6 million N & W revenues from traffic interchanged with petitioners represent other traffic originated or terminated by petitioners and susceptible to diversion by them.

32. We therefore find it unnecessary to pass upon the validity of another theory developed by the Commission, 330 I.C.C. at 808–09, based on the higher value of traffic gained (or not lost) by N & W than of traffic lost by petitioners. Apart from other criticisms, this theory does appear to be inconsistent with the treatment of petitioners' gains effected through rerouting which were estimated to produce net income of about 41 or 42 cents per dollar of gross, 330 I.C.C. at 815, 817, 821.

*Considerations Relating to Individual Roads, and B & M's Complaint That the Price for It Is Inadequate.*

Even if we had reached a different result on the traffic issue just discussed, we would sustain the prices fixed by the Commission on the basis of other factors relating to individual roads.

### (1) *Erie-Lackawanna.*

E–L cites many elements of conservatism in the valuation of its property which N & W has not successfully challenged. The Commission's figure of adjusted earnings took account of a potential $2.2 million increase in E–L's New York property taxes that cannot occur before 1971, allowed for $3.3 million in additional contingent interest charges that will not be incurred before 1972, and ignored a $1 million saving in income taxes that E–L will contribute to N & W forthwith. While the earnings comparisons would have supported a ratio of 0.172 shares of N & W for each share of E–L, the Commission first marked this down by some 25% to 0.128. Furthermore, the stock in the new N & W subsidiary that would be issued to E–L shareholders is not convertible into N & W stock for five years, unless the Keogh bill is enacted at an earlier date. In the interim E–L stockholders would almost certainly receive no dividends. N & W's financial expert testified that similar shares would sell for 15–20% less than the N & W common into which they were ultimately to be convertible. Discounts of this magnitude demonstrate the fallacy of an attack directed at any single item of earnings; we cannot emphasize too strongly that the Commission's exchange ratios represented an informed judgment on all elements of value rather than a mere mathematical calculation from some of them. The Commission also correctly noted that "even if E–L earnings are not sufficient to support the proposed stock exchange ratios, N & W's investment is protected since E–L's income would be earned subject to five substantial tax benefits," including several not heretofore mentioned. 330 I.C.C. 816 and 846–47. E–L's brief contains computations not challenged by N & W showing that tax savings will insure N & W's recovery of its $55 million investment in E–L within 10 years even if E–L earned nothing.[33] In the light of all this, the Commission was justified in concluding that any overestimate of E–L's earning power was fully compensated, 330 I.C.C. at 816.

### (2) *Delaware & Hudson.*

D & H brings forward equally persuasive examples of the Commission's conservatism. On the cash alternative, which is what N & W sought and will almost surely exercise, see fn. 22, D & H receives no credit for the $2.13 million gross revenues it will gain through rerouting. Hence the $3.08 million gross revenues estimated by N & W to be lost to Penn-Central are fully offset by these gains and the $852,000 of N & W revenues on interline traffic with D & H which the Commission found its inclusion would save.[34] Furthermore the cash alternative gives D & H no credit for $565,000 a year in control savings. Beyond all this is the indeterminate gain to N & W in obtaining new traffic as a result of D & H's inclusion.

N & W argues against this that the purchase of D & H's assets in a transaction wherein D & H's loss is recognized for tax purposes will result in larger income taxes for New D & H since it will not retain Old D & H's high basis for depreciation and will be unable to continue certain methods of accelerated depreciation. Having rejected a D & H merger proposal that would have pre-

---

33. We fail to appreciate the force of N & W's answer, namely, that E-L's financial expert testified his recommended exchange ratio was justified only if E-L had earnings at the level estimated by him. The Commission was not bound to adopt this testimony.

34. N & W's contention that this finding is inconsistent with the Commission's "adoption" of N & W's Penn-Central loss study is unconvincing. The Commission accepted this only as a "rough estimate" which gave N & W the benefit of the doubt.

served these tax benefits and produced substantial added control savings, N & W has no legitimate complaint when in deference to its objection the Commission sanctioned a different form of inclusion giving D & H substantial tax benefits but allocating to N & W $4,500,000 of them—nearly half of what it asserts the capitalized cost of the increased annual income taxes of $768,000 to be. Such action was well within the latitude accorded the Commission.

### (3) Boston & Maine.

N & W's complaint as to the valuation of B & M stresses that company's long record of net income deficits, the lowest of which was $578,000 in 1965 followed by $1,540,000 in 1966. In light of this it attacks the Commission's black figure of $1,486,000 as irrational. However, this figure reflects the addition of $717,000 to net income as a result of $1,720,000 of traffic gains through rerouting and the deduction from expenses of $328,000 of control savings. The issue thus turns on the propriety of an estimated $441,000 of pre-inclusion income,[35] and this depends in large part on the savings anticipated from passenger train discontinuances, a subject within the Commission's expertise. Moreover there is some cushion in its scale-down of the exchange ratio for B & M common stock from .126 to .110 and preferred stock from .220 to .175. There remains only the issue of traffic losses to Penn-Central. As the initiating carrier has the greatest influence on shipper routing decisions, and B & M initiates a considerable portion of its traffic, its estimated loss—$1.89 million —is the lowest of any of the three carriers, not only in absolute but in percentage terms. Its position as an originating carrier should also enhance its ability to protect N & W traffic.

In sharp contrast to N & W's argument, B & M claims it has been undervalued. Although it alleges an under-estimate of traffic gains, its more persuasive point concerns control savings. B & M sought inclusion through merger, and submitted studies as to the consequent savings on both a two-way and a four-way basis. However, when it became apparent that merger was not in the cards for any of the three carriers, petitioners' witness Wyer presented testimony on the savings (and traffic gains) resulting from inclusion as controlled subsidiaries. Wyer concluded that the only savings under control would be those resulting from consolidation of the traffic solicitation forces; he thought that savings from the consolidation of administrative forces available under merger would not accrue under control because of difficulties in working out agreements with labor organizations that would permit the transfer of work from one company to another. The Commission adopted his figures. By petition for reconsideration B & M sought an increased valuation relying primarily on testimony by a witness proffered by N & W and C & O–B & O in their merger proceeding, F.D. 23832, that demonstrated an intention to operate E–L, D & H, B & M, CNJ and Reading, if included as controlled subsidiaries under the DERECO plan, in a manner that would effect economies (and traffic gains) considerably exceeding those estimated by Mr. Wyer. B & M then combined this testimony with Commissioner Webb's view, "There is no reason to believe that EL, D & H, and B & M as wholly owned carrier subsidiaries of a little Dereco would enjoy a greater measure of independence than they would as subsidiaries of a larger Dereco, or that N & W could coordinate the operations of five such subsidiaries but not of three," p. 58. The Commission was unpersuaded, 331 I.C.C. at 38–41.

We cannot fault the Commission for refusing to fix a higher value for B & M stock or for rejecting its request to deny its petition for inclusion if a higher

35. Commissioner Webb's estimate of B & M's prospective earnings, which the Commission accepted as a starting point, was $605,000. Since this figure includes $164,000 (50% of the $328,000) in traffic gains, it is only the remaining $441,000 that does not come from either control savings or traffic gains from rerouting.

value could not be set and thereby safeguard its right to seek compulsory inclusion in Penn-Central. We must indeed confess surprise that control savings would be as limited as Mr. Wyer estimated; we should have supposed that, notwithstanding the problems arising from labor agreements, it would be possible over the years to effectuate many savings in such categories as top management, purchasing, planning, engineering and accounting. B & M concedes, as it must, that a party cannot normally object if an agency has awarded all that its witness has claimed; if a carrier chooses to present its case on a basis more conservative than the facts would warrant, the Commission can take it at its word. However, it contends for a different result here on two grounds.

Calling attention to the Commission's over-all public interest findings that petitioners will benefit from "unified management" including "joint routes of affiliated lines, the prospect of single line service, elimination of interchanges, improved schedules, and a more flexible distribution of equipment," 330 I.C.C. at 795, B & M says these findings show that the Commission thought that larger savings could be achieved than witness Wyer had estimated, but nevertheless failed to allow B & M corresponding benefits. We find in this no legal basis for reversal. While the Commission seems indeed to have believed that control savings would exceed those claimed by witness Wyer, it was not bound to attempt to price these out into increased earnings without the aid of detailed evidence and B & M had not furnished this.

B & M's other contention is that the Commission was required to reopen the record because such evidence was furnished by the witness in the N & W–C & O–B & O merger case. We think not. Apart from N & W's contentions that this testimony was based on inclusion of five roads in a larger system rather than of three in a smaller one and that it had been prefigured by earlier testimony long known to B & M, the issue had always been what savings could be effected by inclusion of the three roads as controlled subsidiaries, not what N & W would choose to effect. Commissioner Webb's general statement, largely directed at traffic matters, cannot be taken as a finding that any specific savings beyond Wyer's figures would be achieved. Furthermore, a reopening could hardly be so limited as B & M wished. What we said in section I of this opinion concerning the complaint of the Reading applies equally to B & M. Proceedings of this complexity must sometime come to an end; all that is required is that a party should have had a fair opportunity to prove its case and that the decision be supported by the evidence tendered. On the other hand it is reasonable to consider the conservatism of the estimate of control savings demonstrated by B & M as a further "cushion"—and this comment applies to E–L and D & H as well.

■ In its other major attack on the price fixed for B & M, N & W argues that it cannot fairly be directed to make any substantial payment for the stock since B & M has $46.5 million of First Mortgage Bonds, whose maturity has recently been extended to July 1, 1970, and other nonequipment obligations of $19.4 million falling due that year. The Commission's answer, "We foresee no danger to the N & W system" and "Whether able to meet all the demands of its capital structure or not, and whether in reorganization or out, B & M should continue to operate within one of the larger systems being developed in the East," 330 I.C.C. at 822, scarcely meets N & W's point that it should not be compelled to issue stock worth $10,000,000 for B & M shares that might be found worthless in a reorganization three years hence. Here again N & W is seeking certainties beyond what life affords. It is hard to believe that bondholders who have twice extended maturities to a deficit-ridden railroad beset with management conflicts would refuse to do this for a property well on the way to recovery under the control of one of the most efficient carriers in the east. Moreover, if the Commission's forecast of earnings is correct,

the B & M stock would not be worthless in reorganization; one of the very purposes of § 77 of the Bankruptcy Act is to preserve the equity of stockholders when insolvency has been precipitated by inability to meet maturities. See Continental Illinois Nat'l Bank & Trust Co. of Chicago v. Chicago, R. I. & P. Ry., 294 U.S. 648, 672, 55 S.Ct. 595, 79 L.Ed. 1110 (1935).

### The Possibility of Non-Inclusion of D & H and/or B & M.

N & W's final argument relates to the possibility that less than all three roads may in fact accept inclusion. The Commission's finding that inclusion of D & H was in the public interest was predicated on actual inclusion of E–L and a similar finding as to inclusion of B & M hinged on actual inclusion of both E–L and D & H, 330 I.C.C. at 868. Affirmative action by E–L's stockholders has now assured its inclusion if the present terms stand. Although D & H's board of directors has unanimously voted to recommend similar action to its stockholders, there is a theoretical possibility that the necessary vote might not be forthcoming even though rejection would forfeit D & H's right to ask the Commission to compel Penn-Central to take it over on equitable terms, 330 I.C.C. at 868–69. And although D & H is included, B & M's stockholders might reject the terms despite the fact that in such event (although not in the case of rejection by D & H), B & M would lose the right to ask the Commission to compel its inclusion in Penn-Central. Yet, says N & W, all the figures of traffic gains, of losses to Penn-Central, and of protection of N & W revenues against Penn-Central diversion proceeded on the assumption that all three roads would be included, and the values fixed for E–L and D & H will be excessive if this does not occur.

The record, which contained not only a study of the gains from inclusion of all three roads (the "four-way" study) but studies of the gains from the inclusion of each, supports the earnings ratio established for E–L even on the assumption that neither D & H nor B & M is included. The "four-way" study, adopted by the Commission, details the traffic each of the roads is expected to reroute to the others. It demonstrates that only $1.25 million will be added to E–L revenues by inclusion of D & H and B & M. See chart at 330 I.C.C. at 834, line 2, columns 2–4. The data submitted in E–L's "two-way study" supports this. But a revenue loss of $1.25 million will reduce E–L's added net income by only some $500,000—a difference that is not critical in light of the many "cushions" we have analyzed. Similarly, if B & M is not included, D & H's revenue from rerouting would have to be reduced by only $490,000, see chart at 330 I.C.C. at 834, line 3, columns 3–4, which amounts to a reduction of only $200,000 in net income. N & W's only challenge to this proceeds on a basis already considered and rejected, see fn. 20.

N & W answers that the effect of non-inclusion on the traffic gains of included roads is only a small part of the story. An even larger part, it says, is that non-inclusion of one or more lines would increase the losses the included ones would suffer to Penn-Central and decrease their ability to protect N & W from diversion; yet the Commission made no findings about this. The number of hypotheses to be considered were so numerous [36] that any attempt to make de-

---

36. Assuming E–L to be included in N & W in all cases, the following hypotheses, in addition to inclusion of all three roads, would have had to be separately analyzed:

| D & H | B & M |
|---|---|
| (1) Independent | Independent |
| (2) Independent | In Penn-Central |
| (3) In Penn-Central | Independent |
| (4) In Penn-Central | In Penn-Central |
| (5) In N & W | Independent |
| (6) In N & W | In Penn-Central |

tailed studies of all of them not only would have protracted an already long proceeding but would have introduced so many elements of speculation concerning the traffic policies of each road and the susceptibility of shippers to them as to render the endeavor almost ludicrous. Although N & W as custodian of the figures and knowledge had the burden of presenting evidence that would permit a judgment of the degree to which petitioners would protect its traffic, it failed to do that even on the assumption that all three were included, let alone on less probable eventualities. As to the other question—the extent to which the lines that accepted inclusion would suffer increased losses to Penn-Central as a result of their brethren rejecting the terms—the Commission did deal with the only such hypothesis having reality.[37] It cited Commissioner Webb's finding that, "Without B & M in the N & W system, it can also be properly assumed that the traffic losses of E–L and D & H to a Penn-Central system would be somewhat larger than estimated with B & M controlled by N & W." 330 I.C.C. at 840. The assumption that the losses would be only "somewhat larger"[38] was within the Commission's expert competence in the absence of detailed contrary evidence. If B & M is not included but remains independent, it would have the strongest reasons for continuing and developing the historic interchange of New England traffic with D & H at Mechanicville, N. Y., especially with that carrier a part of a vigorous N & W system and possessed of trackage rights over PRR between Wilkes-Barre, Pa., and Hagerstown, Md.,

rather than exchanging such traffic at Rotterdam Junction, N. Y., with Penn-Central which would have several routes of its own into New England. While the situation would, of course, be different if B & M were to become part of Penn-Central, it is at least questionable that this will be permitted over N & W's objection, for reasons indicated in Mr. Justice Brennan's concurring opinion in Baltimore & Ohio R.R. v. United States, supra, 386 U.S. at 408–409, 87 S.Ct. 1100; in any event it is inconceivable that the Commission would approve inclusion of B & M in Penn-Central without imposing conditions to safeguard the Mechanicville interchange to the maximum feasible extent. With all the weapons available in the Commission's armory to deal with this situation, it was not required to anticipate the problem and attempt to make findings dependent on so many contingencies as to be illusory.

N & W asserts, however, that the contrary evidence to which we have alluded is furnished by testimony of E–L Traffic Vice President Schmidt in the Penn-Central case, in which he asserted, based on a study of one month of 1961, that as an independent railroad E–L would probably suffer losses of $44 million to Penn-Central. But the Hearing Examiners in that proceeding described Schmidt's estimate as "highly exaggerated," p. 374.[39] In the instant proceeding Schmidt testified that if E–L alone merged with N & W, its losses to Penn-Central would be $8.5 million; he made no estimate as to the losses if E–L where included as a subsidiary.

37. For reasons developed in section IV of this opinion we cannot take the prospect of non-inclusion of D & H at all seriously.

38. Commissioner Webb added, "Again, the amount of such additional loss cannot be determined from the record but it would not be so large as to alter the ultimate conclusion reached in this section of the report." Report, p. 66. Although the Commission did not explicitly adopt this recommendation, we find no basis for N & W's contention that the Commission disavowed findings not reproduced in Ap-

pendix A. To the contrary, adoption of this finding seems implicit in its order. See Pacific States Box & Basket Co. v. White, 296 U.S. 176, 186, 56 S.Ct. 159, 80 L.Ed. 138 (1935).

39. In the course of the inclusion proceeding N & W counsel characterized Schmidt's study as "very curious" and said, "we were unable to trace [it] through with any degree of particularity and were unable to develop anything helpful in a numerical way in the cross of Mr. Schmidt." Transcript pp. 3275–76.

Still further considerations support the Commission's action as to D & H. N & W does not dispute the evidence indicating that even if D & H were an *independent* carrier, it would lose only $1.3 million more in revenue to Penn-Central than if *all three roads* were included in an N & W system. Even if that same figure be used for D & H as part of an N & W-E–L-D & H system, the impact on net income would be offset by the $565,000 in control savings—itself a low estimate even if N & W does not merge with D & H as it apparently could—which were not credited to D & H on the cash option that N & W requested and will almost certainly exercise.

 To summarize, there is a sufficient finding, supported by adequate evidence, that B & M's non-inclusion would not undermine the fairness of the terms set for the inclusion of E–L and D & H. While the Commission made no finding as to E–L's Penn-Central losses in the event that D & H also were not included, rejection by D & H's stockholders is so unlikely, as we will later show, that we will not reverse on that ground. The mandate of § 8(b) of the Administrative Procedure Act for reasoned findings and conclusions on all material issues should not be read as requiring agencies to deal in a detailed way with every possibility no matter how unlikely, or as directing a reviewing court to close its eyes to realities in pursuit of academic perfection. Presumably Congress intended that administrators should be able to administer. Moreover, it would have been wholly impracticable for the Commission to ask E–L and D & H to go to their stockholders with purchase prices sliding downward in the event of adverse action by stockholders of other roads. The Commission exercised the best over-all judgment it thought possible under the circumstances, and its valuations for E–L and D & H must be taken to have encompassed the possibility that all three roads might not enter their new home. Compare Group of Institutional Investors v. Chicago, M., St. P. & P. R.R., 318 U.S.

523, 538–539, 63 S.Ct. 727, 87 L.Ed. 959 (1943).

*Complaint of E–L Bondholders.*

John Hancock Mutual Life Insurance Company, The Prudential Insurance Company of America, Aid Association for Lutherans and Woodmen of the World Life Insurance Society, holding large amounts of E–L bonds, ask for "equitable safeguards necessary to prevent the circumvention of their rights as bondholders." Their main point is that "N & W will have the incentive to use its control of New E–L to increase the traffic and income of its own lines rather than those of New E–L, e. g., by diversion of traffic and other benefits from New E–L, to the detriment of New E–L" and its bondholders. The alleged incentives are various—N & W can make more money by handling traffic on its own more efficient line west of Buffalo; while the present E–L stockholders have an interest in earning net income and paying the interest charges in order to clear the way for the declaration of dividends, N & W will prefer that New E–L should not have net income available for payment of the contingent interest and arrearages on the income bonds; and it will be glad to see the price of E–L bonds depressed in order to facilitate market purchases or tender offers.

Before submitting any plan for inclusion in N & W, E–L wrote thirteen of its major bondholders, including two of the plaintiffs, explaining both the greater advantages of merger and its disbelief that the Commission would approve this unless the E–L bondholders would consent to modification of the bonds. They refused. It was for this reason that E–L proposed stock control by N & W rather than merger, with attendant lesser economies and traffic gains and lower exchange ratios for its stockholders. The bondholders did not participate in the hearing before Commissioner Webb; on the last day for filing exceptions to his Report, they sought leave to intervene and to file an exception asking the Commission to impose some sort of safeguard for their benefit.

We find no merit in the bondholders' complaint. The Interstate Commerce Act contemplates acquisitions of control by sale of assets subject to existing indebtedness as well as by merger or consolidation, which, as E–L correctly thought, would have been inequitable to N & W unless E–L's debt was modified. The bondholders do not contend that the indentures securing their bonds forbid a sale of assets. The smaller traffic gains and control savings estimated for E–L reflect N & W's inability in a control situation to do the very things the bondholders fear. While no one can guarantee that N & W may not abuse its position, courts of equity will still sit. The safeguards the bondholders seek are furnished in large measure by the principle of fiduciary responsibility recognized in such leading cases as Farmers Loan & Trust Co. v. New York & Northern Ry., 150 N.Y. 410, 44 N.E. 1043, 34 L.R.A. 76 (1896), and Southern Pacific Co. v. Bogart, 250 U.S. 483, 39 S.Ct. 533, 63 L.Ed. 1099 (1919). If they wished more than this, they should have developed a record at the hearing and then come forward with specific suggestions. Failing to have done this, they cannot properly request a remand.

IV. INJUNCTION OR STAY OF CONSUMMATION OF THE PENN-CENTRAL MERGER

We now return to the merger cases and consider the Commission's determination that, with the Appendix G conditions revised and effective, the public interest requires consummation of the Penn-Central merger "at the earliest possible date," 330 I.C.C. at 361.

Ever since the Supreme Court reversed our denial of a temporary injunction, the parties have been in bitter disagreement as to the meaning of its opinion. There was no need for immediate decision on our part since there could be no dispute that the Court intended the merger to be enjoined until the Commission had finalized the Appendix G traffic and financial conditions and had decided the applications of the three roads for inclusion in N & W. In our order of April 28, 1967 we therefore took a Delphic stance, enjoining consummation "pending the completion of the proceedings directed by the Supreme Court." In our memorandum order of July 3, 1967, we reviewed the conflicting contentions and the passages of the Court's opinion relied on to support them. We tentatively concluded that the Court had not directed us forthwith to enter an order enjoining consummation until all details of the inclusion of the three roads were resolved but, on the other hand, that as a matter of discretion we should extend the injunction at least until our own final determination in the merger cases "and thereafter for such further time, if any, and to such extent and on such terms as this Court may then direct." We have now decided not only the merger cases but also the *Inclusion* case, and must face the issue whether we must or should continue the injunction against consummation of the Penn-Central merger and, if so, for how long.

Because of our desire to obtain all available light on the Supreme Court's intentions, we requested the parties to furnish us with any excerpts from the briefs or arguments before it that might be helpful. While the help is limited on any view, since the Court cannot be assumed to have adopted the position of any party, the excerpts from the argument confirm our belief that the broad construction urged by some of the parties is unwarranted. Of particular importance is the passage where the then Solicitor General, now Mr. Justice, Marshall restated "the position of the United States in this case" at the close of the argument—apparently departing somewhat from that taken in brief, 386 U.S. at 384–85. The position was "that the consummation of the Penn-Central merger ought to be delayed until the Commission has, (1) determined the fate of the smaller roads adversely affected by the merger, and, (2), has provided for the interim protection until the inclusion. This does not, of course, mean that we urge a stay of consummation until all

of these judicial review proceedings are completed, the two-year forecast, the two and a half, the five year, and the if ever forecast. For the present our only point is that the Commission should not let Penn and Central merge until it has satisfied itself what to do about these railroads, the smaller ones. That does not mean the consummation must be delayed until the small roads are actually included in any of the systems. Once the Commission has finally decided their fate, the mechanics of the inclusion can wait so long as interim protective conditions are in * * *." It is also of interest that counsel for E–L and D & H, along with B & M the objects of the Supreme Court's concern, stressed in their argument to the Court, as they had to us, that their complaint related to the Commission's failure to finalize the protective conditions. Only the argument of N & W and its allies that it was entitled to know exactly what Penn-Central would or would not include, since competition with a Penn-Central system containing the three roads would be more onerous than if these were in N & W, would be consistent with the broad reading now urged; the short answer to this would seem to be that the interests of N & W and those making common cause with it are protected by their right to oppose and challenge any future order including any of the three roads in Penn-Central. Consideration of the argument thus buttresses our conclusion drawn from the passages of the opinion, 386 U.S. at 378, 390 and 392, 87 S.Ct. 1100, 18 L.Ed.2d 159, cited in our previous order, that the Supreme Court has not directed a further injunction but has left that issue to be determined by application of the principles governing judicial review of administrative action to the facts before us.

E–L and D & H (but not B & M), together with N & W and its allies, argue, with various nuances of difference, that the public interest forbids consummation until doubts as to the future of the protected roads are finally resolved. The remaining doubts are of two sorts. One, developed in section III of this opinion, relates to stockholder action—the stockholders of D & H may reject inclusion, thereby also precluding inclusion of B & M, and stockholders of the latter may do so on their own. The other uncertainty concerns possible Supreme Court reversal of our decisions, more particularly a reversal in the *Inclusion* case which by requiring less favorable terms would call into question the action already taken by stockholders of E–L and would enhance the risk of adverse action by stockholders of D & H and B & M. Doubts of the first type are those to be considered in making our own decision whether to continue the injunction. If we rule against this, the second set of considerations is relevant to determining whether to grant a stay pending appeal.

We find ourselves unable to take seriously the possibility that D & H stockholders will reject their directors' unanimous recommendation to accept the inclusion terms. The cash price fixed by the Commission works out at $41.79 per share as against an average 1967 market price until the date of decision of about $34, 331 I.C.C. at 33. The prospect of operating as an investment company with some $66,000,000 in cash and substantial tax credits appears considerably brighter than that of continuing as a small independent railroad seeking better terms from N & W or attempting to work out a voluntary agreement with Penn-Central. While the situation as to B & M differs since the price fixed by the Commission for its stock is well below the current market, that carrier not only does not seek continuation of the injunction but actively opposes it, believing that consummation of the Penn-Central merger is needed to prod N & W into offering what it considers realistic terms. Even if B & M should be overly sanguine about this, a court has no duty, very likely even no right, to give it a protection it does not wish, and its non-inclusion in N & W will not impede the inclusion of E–L and D & H nor, on our view, require any change in the terms the Commission has fixed. When the case was last here, the principal, indeed al-

most the sole, bone of contention among the parties, and the only issue that caused division among us, was the argument that although the Commission had found Appendix G conditions to be necessary, it had not in fact prescribed them in definitive form—in Judge Weinfeld's words, "that the rescission of one of the conditions and the reopening for further consideration of the other conditions originally imposed by the Commission for the protection of" E–L, D & H, and B & M "as a prerequisite to the merger requires the granting of the interlocutory injunction." The Commission has now done what the Supreme Court directed it to do, and has expressly found that, subject to the conditions it has prescribed, "the public interest requires that the applicants be permitted to commence achieving the substantial savings which their merger will make possible at the earliest possible date;" that "the shipping public should not be denied the improved service which ultimately the merged company can provide;" that it was "unwilling to take the risk that further delay in consummation of the merger may mean that it will never occur—and that New Haven will not be included in a larger rail system;" and that it was particularly unwilling to do this in view of the demonstration in its report in F.D. 21510 "that inclusion of E–L, D & H and B & M in the N & W system is both consistent with the public interest and feasible, and in view of the fact that the instant report provides for those lines pending their actual inclusion even stronger interim protection than did our prior report." 330 I.C.C. at 361. We would not feel warranted in overruling the Commission's informed judgment, concurred in initially by all three of the affected railroads and still accepted by B & M, that proper Appendix G conditions take sufficient care of them while they work out their future, which, if our order in the *Inclusion* case stands, is practically assured for the only two that protest.

The final question is whether, although denying a further injunction, we should grant a stay pending appeal to the Supreme Court. The criteria were authoritatively stated by Mr. Justice Brandeis in Virginian Ry. v. United States, 272 U.S. 658, 673, 47 S.Ct. 222, 228, 71 L.Ed. 463 (1926):

> "To justify granting the stay after a final decree sustaining the Commission's order, it must appear either that the District Court entertains a serious doubt as to the correctness of its own decision, or that the decision depends upon a question of law on which there is conflict among the courts of the several circuits, or that some other special reason exists why the order of the Commission ought not to become operative until its validity can be considered by this court."

Although appraising the correctness of one's own decision is a tricky business, we entertain no doubt with respect to our rulings in the merger cases. The only issue that seems at all debatable is the capital loss indemnity and, as we see it, the Supreme Court could correct any error on our part even after consummation; moreover, the issue would become academic as to the protected roads if the Court should affirm us in the *Inclusion* case. While that case has presented considerably more difficulty as our discussion has shown, we have no "serious doubt" we have reached the right result. The fact that the criticisms mainly relate to subsidiary findings, or the lack of them, rather than to the Commission's ultimate conclusions works against the probability of reversal. In Massachusetts Trustees of Eastern Gas and Fuel Associates v. United States, 377 U.S. 235, 248, 84 S.Ct. 1236, 12 L.Ed.2d 268 (1964) the Court made plain that SEC v. Chenery Corp., 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943), so heavily relied on by N & W, was intended only to establish the important point that a reviewing court could not affirm an agency on a principle the agency might not embrace —not to require the tedious process of administrative adjudication and judicial review to be needlessly dragged out while court and agency engage in a nigh end-

less game of battledore and shuttlecock with respect to subsidiary findings.

Moreover, if the Supreme Court should disagree with our decision in the *Inclusion* case, it would not itself establish different terms but would direct a remand to the Commission. If the remand were for the purpose sought by B & M, this would in no way prevent inclusion but rather would facilitate it. On the other hand, if the remand were on N & W's appeal, our discussion has revealed many ways by which, in our view, the Commission could support terms as favorable as it has established even if the Court should have held some of its subsidiary findings to be insufficient. We thus cannot foresee any substantial likelihood that action by the Supreme Court will worsen the chances of the three roads' inclusion in N & W.

Since our decision does not conflict with that of any other court, we are thus left with the question whether there is "some other special reason" for a stay. As to this we would be inclined to regard the irreversibility of the Penn-Central merger, see 386 U.S. at 391–392, 87 S.Ct. 1100, and the Supreme Court's obvious interest in this case as reasons sufficient to warrant a few months' delay if it were not—and the "if" is a literally vital one—for the critical situation of the New Haven.

■ No one has contested the forecast of the NH Trustees that their cash will run out at the end of 1967; no one has indicated any probable source of funds for that beleaguered property other than the merged Penn-Central. Despite our utmost efforts to expedite the argument and decision of these cases, we are now in late October, and the appeal of our previous order of early October 1966, handled by the Supreme Court on an expedited basis, was not decided until late March 1967. While these facts are unpleasant, they are nonetheless inexorable. For our part we are unwilling to take responsibility for such devastating hardship as even a temporary cessation of NH's operations would bring to New England and New York and in a lesser degree to other sections of the country when in our view there is no reason why the merger should not proceed; indeed we believe we have no right to do so. Whether the Supreme. Court may think differently or would wish to hear an appeal either of the entire case or of some part of it on an even more expedited basis that would permit a decision prior to December 31, 1967, no one else can determine. We therefore stay consummation of the merger only for fifteen days and if within that period a notice of appeal to the Supreme Court is filed and application for a stay is made to it, until the determination of such application or other order of the Court or the Circuit Justice.

### Judgment

The clerk is directed to enter judgment as follows:

(1) All complaints and intervening complaints in 66 Civ. 2860, in 66 Civ. 2903, and in 66 Civ. 2914 except that of The Central Railroad of New Jersey, are dismissed. The court finds there is no just reason for delay in the entry of judgment dismissing the other complaints in 66 Civ. 2914 and so directs, F.R.Civ.P. 54(b).

(2) The complaint and intervening complaint in 66 Civ. 3413 are dismissed without prejudice to any action plaintiffs may be advised to take with respect to any further order in F.D. No. 21989 relating to temporary assistance to the New Haven or the inclusion of the New Haven in Penn-Central.

(3) All complaints (including that of N & W as involuntary plaintiff) and intervening complaints in 67 Civ. 2451 are dismissed. Enforcement of the order of the Commission in F.D. 21510 with respect to N & W is stayed until fifteen days from the date of this order, and if within that period N & W files a notice of appeal to the Supreme Court of the United States and prosecutes said appeal in accordance with the rules of said Court, until the determination thereof.

(4) The portion of the Commission's order in F.D. 21989 authorizing immedi-

ate consummation of the Penn-Central merger and the beginning date of the 180-day period fixed by the Commission in its order served June 12, 1967, for ·exercising the authority there conferred, are stayed until fifteen days from the date of this order, and if within that period a notice of appeal to the Supreme Court is filed and an application for a further stay is made to that Court, until the determination of such application or other order of the Court or the Circuit Justice. Except to the limited extent provided in this paragraph all applications for injunctions against consummation of the Penn-Central merger are denied.